71 So.2d 102

## PICKETT v. STATE.

### 5 Div. 422.

Court of Appeals of Alabama.

Dec. 8, 1953.

Rehearing Denied Jan. 5, 1954.

Si Garrett, Atty. Gen., L. E. Barton, Asst. Atty. Gen., for the State.

J. A. Walker, Jacob Walker, Jr., Walker & Walker, Opelika, for appellant.

HARWOOD, Judge.

This appellant was jointly indicted with his brother, John Eddie Pickett, for murder in the first degree of Charlie Frazier. A severance being demanded the appellant was tried separately.

The appellant interposed pleas of not guilty, and not guilty by reason of insanity.

The jury returned a verdict of guilty of murder in the second degree, punishment being fixed at 15 years imprisonment, and judgment was entered accordingly.

The shooting occurred at the home of Charlie Frazier, the deceased. He was having a fish fry. There was guitar music, and dancing. The function was open to the public, and was commercial as well as social in tone in that the guests paid for any refreshments they obtained.

As is not unusual when difficulties take place at affairs of this nature the evidence is in hopeless conflict and diverse in its trends, even on each side of the case.

As we read the record there was evidence presented by the State tending to show that the appellant, his brother John Eddie, his father, Early Pickett, and his mother were at the entertainment. A difficulty ensued between John Eddie and one Hayward Green in one of the rooms of the house. The father, Early Pickett, intervened and stopped the disturbance. According to Hayward Green the father told John Eddie to come on and go, "and we will come back." This remark was not heard by any other of the witnesses, however. The father, mother, and John Eddie left without Roosevelt, the appellant. According to one or more of the State's witnesses the father and his two sons returned in about 20 to 30 minutes in an automobile. The two sons got out of the car, and the father, Early, remained in it. The appellant was carrying a shotgun and John Eddie a rifle.

John Eddie walked toward the house and entered a door, with the barrel of the rifle pointing straight up. Just as he entered the room several men grabbed him and Charlie Frazier, the deceased, approached the difficulty.

At this time the appellant, who had lingered in the yard, fired a shotgun into the melee. One of the buckshot with which the gun was loaded entered Frazier's heart and he fell with this mortal wound.

The evidence for the defense was directed toward showing that the appellant did not leave with his family after the difficulty between John Eddie and Green, but remained at the scene; that when the Picketts returned to their home John Eddie was directed to go to bed. Instead he slipped out of the house and returned to Frazier's place. The father, upon discovering John Eddie's absence went to Frazier's after him, but did not arrive there until after the shooting.

John Eddie, in his testimony, claimed that he had hidden the rifle in a nearby cotton patch early in the evening, and upon his second visit he was taking the rifle into the house in order to pawn it.

Among the grounds assigned in support of the motion for a new trial were ones to the effect that the verdict was contrary to the law, and was contrary to the evidence, in that the uncontradicted evidence tends to show that the appellant was insane at the time of the commission of the offense.

In the trial below, in support of the plea of insanity the defense offered a number of lay witnesses, and a medical witness.

Mr. Oliver Coley testified that he had known the appellant ten years or longer. In response to a question as to what he had observed about the appellant Mr. Coley answered as follows:

"A. Well, for the last year and a half Roosevelt has worked for me off and on, part of the time he was farming with his daddy. And when he worked for me, I had to always either be with him or have somebody else to look after him, because he wouldn't stay on the job. Of course you could put him to doing one thing, and he would get off to doing something else. I could send him after something and he would not get what I sent him after. It would be something else that he would bring back.

"Q. If you sent him for a hammer, what would he bring back? A. He would bring back a saw or a can of gas or something like that."

Mr. Hilton Bentley testified that he operated a grocery store in Notasulga, and had known the appellant for about three years; the appellant bought lunches at the store. In the words of this witness: "You couldn't understand anything he would say. He would just have to point out objects he

would want, like that. He couldn't count, he couldn't write his name or count money. I would have to do all that for him."

Mr. Coley Langley testified that he was in the mercantile business and had known the appellant about a year. The record shows the following during the direct examination of this witness:

"Q. Tell the Jury how he has conducted himself when he would come into your place of business. A. Well, he was working for Mr. Coley and Mr. Coley was trading there with me. He came in there, the first time I saw him, he came in there one night about dark and said Mr. Coley said for him to get something to eat there, and I couldn't understand what he was saying at all, in fact, I just thought he was some fellow that was about half cracked or crazy coming along the road. I didn't believe his story or anything and I just told him to get on out of the store. I couldn't understand anything he was saying."

Later the appellant began coming to witness' store at least three times a week to purchase merchandise.

Mr. J. W. Zachary testified that he lived about two and a half miles from the appellant's home and had known him some 12 or 13 years, and had tried to work him. In this connection this witness testified:

"Well, if you put him off in the field plowing by himself, you are just likely to go back and find him in another field plowing. And if he goes to plow cotton, why he is liable to scrape a row or get on the wrong side, and if you send him to the house after a scrape he is liable to bring a scooter or a shovel as anything else."

Precious Pickett, the mother of the appellant, testified that she first noticed that the appellant was different from the other children when he "couldn't talk good;" that he was sent to school when he was six years old, but he "didn't learn like the other children."

This witness further testified:

"Q. Did he ever learn to read? A. No, sir.

"Q. Did you ever try to teach him to read? A. Yes, sir.

"Q. Tell the Jury what you tried to do and how he acted. A. When I started him off to learning there at home, I would tell him to say his ABC's and just as soon as I would get away from A B C D, I say, 'You go back now and say where I told you to' and he couldn't even say the first one.

"Q. Did he ever get beyond 'D'? A. No, sir.

"Q. Did he ever get to 'D'? A. No, sir. He couldn't say 'A'.

"Q. Now, how about his counting? What did he do about counting? A. He couldn't do it. I tell him to count and he couldn't count, and I tell him to count his fingers, I tell him to say '1, 2, 3, 4, 5' with his fingers, that way. He couldn't even count his fingers.

"Q. State whether or not he ever learned to count his fingers? A. I don't know whether he did or not. He never did count them."

Charlie Moss, a trustee of the school attended by the appellant, testified that the appellant never "made a grade" during his schooling, and that: "He always did act off from the other kids. He never had nothing to say much. He just would act strange."

Dr. H. S. Holloway, Jr., testified that after graduating from Tulane Medical School he was a rotating interne in Charity Hospital in New Orleans, and in such type of internship he saw all types of patients; he entered the Army upon completion of his internship and was in the military service for about four years, during which time he had a general medical experience; since 1946 he has engaged in the general practice of medicine in Notasulga, and in such practice he has come in contact with patients of unsound mind and has had occasion to treat such illness.

Dr. Holloway further testified that he had known the appellant for some four or five years. Several months previously he had attended the appellant for a broken arm. He had put a metal splint on appellant's arm and had instructed him to report back in two days. He did not see the appellant again for five or six weeks. The appellant had removed the splint and the bones had knitted but in a crooked manner. When the appellant was brought in the five or six weeks after he had splinted the arm Dr. Holloway was asked what could be done. He declined to attempt further treatment.

Dr. Holloway further testified that in his opinion the appellant was congenitally feeble-minded and was of a mental age of four or five years.

The appellant himself was placed in the witness box. He testified that he lived in Notasulga, but that he did not know how old he was.

There then follows some three pages of questions propounded to him by his counsel, with "no answer" being indicated by the reporter.

Toward the end of his examination he did make some answers, and we excerpt the following from the record:

"Q. Tell him because you are on trial for your life. You had better do the best you can. A. (No answer)

"Q. What did you see old John do? A. (No answer)

"Q. You saw him do something. Tell him, tell that man right in front of you. Don't tell anybody but him. Did you see a man jump on him? A. (No answer)

"Q. Did you see somebody jump on John? A. (The answer sounded like he said) Somebody jump on my brudder.

"Q. Go ahead. Tell us what happened.

"A. Told me he was going to kill me too.

"Q. What else happened. A. Went behind the house, told me same thing.

"Q. Then what happened? A. I come (unable to understand) * * * Picked gun out of corner, then one on the floor.

"Q. And then? A. Didn't see brother at all.

"Q. You didn't see your brother at all? A. Didn't see brother at all.

"Q. What did you do after you picked the gun up in the corner? A. Got 'hind the well. (Unable to understand further.)

"Q. All right. Tell then what else happened. A. (No answer)

"Q. Is that all you know about it? A. (No answer.)

"Mr. Walker: I will let you examine him, Mr. Solicitor.

"Mr. Boyd: No questions.

"Mr. Walker: Come down, Roosevelt.

"The court: Call the next witness, Mr. Walker."

We have set forth the evidence submitted in behalf of the plea of insanity rather in detail in order to fully illustrate the basis of our conclusions. This evidence was uncontradicted. The testimony presented by the lay witnesses and by Dr. Holloway we think leads to the necessary conclusion that this appellant is a congenital mental deficient. Under Dr. Holloway's testimony he should be classified no higher than an imbecile.

Section 422, Title 15, Code of Alabama 1940, provides:

"Every person over fourteen years of age charged with crime is pre-

sumed to be responsible for his acts, and the burden of proving that he is irresponsible is cast upon the accused. The defense of insanity in all criminal prosecutions shall be clearly proved to the reasonable satisfaction of the jury."

■ Writing to the meaning of this statute, the late Justice Bouldin, in Boyle v. State, 229 Ala. 212, 154 So. 575, 583, laid down the following principles:

"We are impressed the wording of our statute, 'clearly proved to the reasonable satisfaction of the jury,' was chosen with studied care, having in mind the test of responsibility defined in the Parsons Case [Parson v. State, 81 Ala. 577, 2 So. 854, 60 Am.Rep. 193], and also the warnings of Chief Justice Stone in his dissenting opinion in that case.

"We are not, however, impressed that the statute contemplates a taking from the trial court the responsibility and duty to give instructions as in other cases where a presumption must be overcome. The affirmative charge, with hypothesis (if the jury believe the evidence), may properly be given for the state on clear and undisputed evidence of guilt, notwithstanding the strong presumption of innocence, to be overcome by proof beyond a reasonable doubt.

"*Cases of insanity may be so clear, the proof so strong and undisputed, that the jury should be instructed in like form.* (Italics ours.)

"But courts should be careful not to invade the province of the jury in cases of this character. Although the evidence may be offered only by the defense, and all tend to one conclusion, yet, in view of the presumption of sanity, if the evidence is inconclusive, and reasonable inferences may be drawn that the act was that of a sane man as defined by law, the affirmative charge should be refused.

"This is but to apply the oft-stated general rule defining the functions of court and jury. We see no sound reason to devise a different rule in insanity cases. The inherent difficulties in considering such issue apply to the jury, the same as the court. Howard v. State, 172 Ala. 402, 55 So. 255, 34 L.R.A.,N.S., 990."

■ Ordinarily the question of insanity is for the jury upon consideration of all of the evidence.

■ Even undisputed expert medical evidence is not conclusive upon the jury, but must be weighed like other evidence, and may be rejected by the jury. Hockenberry v. State, 246 Ala. 369, 20 So.2d 533; Fitzhugh v. State, 35 Ala.App. 18, 43 So.2d 831, certiorari denied 253 Ala. 246, 43 So.2d 839, certiorari denied 339 U.S. 986, 70 S.Ct. 1007, 94 L.Ed. 1388. Even so, opinion evidence, even of experts in insanity cases, is to be weighed by the jury, and may not be arbitrarily ignored. Boyle v. State, supra; and the opinion of a regular practicing physician on a question of sanity is to be accorded greater weight than that of a non-expert witness. Rhodes v. State, 232 Ala. 509, 168 So. 869.

In Howard v. State, 172 Ala. 402, 55 So. 255, 34 L.R.A.,N.S., 990, the appellant had relied on a Utah case, State v. Brown, 36 Utah 46, 102 P. 641, 24 L.R.A.,N.S., 545, wherein the Utah court, in reversing a conviction upon the proof of insanity of the accused had, among other things, written [172 Ala. 402, 55 So. 257]:

"It is not a case where the testimony was limited to the friends of the family or relatives of the defendant, who sought to shield the family from disgrace; but it is a case where a large number of witnesses, without any apparent interest or bias, all agree that the defendant before, at the time of, and after the commission of the alleged offense was, and continued to be, insane, and that he was mentally irresponsible. Under such circumstances, can it be said, * * * that

there is any evidence in support of defendant's sanity?"

After noting that under the Utah law the State must establish an accused's sanity beyond a reasonable doubt after the defense has offered sufficient competent evidence to overcome the presumption of sanity, our court stated:

"This is not the rule in Alabama, where insanity is treated as an affirmative defense, which must be established to the reasonable satisfaction of the jury. Martin v. State, 119 Ala. 1, 25 So. 255. To what extent this doctrine may have influenced the decision of the court, we are unable to judge. Without approving it, we are not disposed to criticise the correctness of the decision in the Brown Case, as applied to the facts shown."

Our court then pointed out that there were decisive distinctions between the case before it and the Brown case, one of the main distinctions being that the appellant had not testified in the Brown case but had in the case then before the court. The opinion pointed out that the appellant had given detailed accounts of the homicide, and of the causes leading to it. The court then observed that this gave "a fruitful opportunity to the jury to form an estimate of his mental condition. * * *

"We only mean to say that there was before the jury substantial evidence from which they might rationally infer that the defendant's mental infirmities did not obscure his intelligence, nor destroy his free agency, in relation to the act with which he stands charged, and the issue was properly submitted to the jury."

While the appellant was placed in the witness box in the present case, there is certainly nothing in his incoherent mumblings, laboriously coaxed from him by the lengthy and patient examination of his counsel, from which the jury could rationally infer that he was sane. Indeed, the only reasonable inference to be drawn from his appearance is one reinforcing the other abundant evidence tending to establish his status as an imbecile.

If this conviction be sustained, it can only be done on the bare presumption of sanity prevailing as to every accused.

The undisputed and substantial evidence as to this accused's mental defectiveness must be deemed to have overcome this presumption.

We are not here dealing with an obscure, difficult form of mental disease, recognizable only by experts in the field of psychiatry, but with a condition of mental imbecility present from birth and easily recognized even by laymen and the entire community. The possibility of feigning such condition is nonexistent, thus removing all suspicion as to its actual existence.

While an accused over the age of fourteen years is presumed responsible for his crimes, the common law, prevailing in this State, with instinctive charity, provided that a person under seven years of age was incapable of harboring a criminal intent, and was therefore not responsible for his crimes; from seven to fourteen years of age he was presumed incapable of criminal intent, but this presumption was rebuttable. Hampton v. State, 1 Ala.App. 156, 55 So. 1018.

Can it be rationally said that the responsibility of a person with the mind of a child of the age of four or five years, regardless of his chronological age, should be determined only by his age in years?

■ This aside, we are convinced that the overwhelming evidence presented by the defense has amply overcome the presumption of sanity as to this accused; that the undisputed evidence shows this accused to be a mental defective of the mental age of four or five years, in other words, an imbecile.

This being so it necessarily follows that the verdict and judgment is contrary to the evidence and the legal principles applicable, and that this cause must be reversed for refusal of appellant's motion for a new trial.

Several other points are urged as error in brief of counsel for appellant. In view

416

of the conclusion we have reached no purpose would be served in writing to such points.

Reversed and remanded.

