351 So.2d 616 (1976)
William Macy CHRISTIAN
v.
STATE.
6 Div. 97.
Court of Criminal Appeals of Alabama.
August 31, 1976.
Rehearing Denied October 12, 1976.
Ralph C. Burroughs, Public Defender, Tuscaloosa, for appellant.
William J. Baxley, Atty. Gen. and Milton C. Davis, Asst. Atty. Gen., for the State.
HARRIS, Judge.
Appellant was indicted for murder in the first degree involving the death of his mother. He was convicted of murder in the second degree and the jury fixed his punishment at 99 years in the penitentiary. He was represented by the Public Defender of Tuscaloosa County. He pleaded not guilty and not guilty by reason of insanity. After sentence was imposed, appellant gave notice of appeal. Being indigent he was furnished a free transcript and is represented on this appeal by the Public Defender's Office.
*617 This is a sad and tragic case. On August 28, 1972, appellant beat his mother to death with a Coca Cola bottle or some type of bottle or blunt instruments. Around midnight on that date Mrs. Rena Owen, who lived next door to the house of appellant's mother, heard someone scream and she got up and looked at the carport next door and saw appellant beating his mother with some type instrument in front of the car parked under the carport. She heard the mother say, "Billy, get away from me." Appellant had dragged his mother from the entrance door of the house to the front of the car in the carport where the beating took place. She heard the breaking of glass and looked out and saw what appellant was doing and she called the Police Department and then awakened her mother who also observed appellant beating his mother. The police seemed to be slow in responding and the mother called them again.
After appellant beat his mother in front of the car parked in the carport, Mrs. Owen and her mother saw appellant pour some substance on his mother and light a match which created a blaze on the body of appellant's mother. After the blaze was lit, appellant moved back and sat on the steps leading into the house.
The police arrived in a few minutes and so did the Fire Department. The Fire Department put out the blaze on the body of the deceased. The deceased was taken to a funeral home where an autopsy was performed. The autopsy report is as follows:
"A. In this particular case, we did a complete autopsy. We examined the head, brains and contents of the skull. We examined the chest and abdomen. When I first saw the body, it was partially embalmed with my permission. The body was burned over the head and frontal portion. There were some injuries to the head and there was burning that extended down the front of the body. To be more specific, there was a four inch rough torn laceration on the right side of the head and underneath that was an obvious break in the skull. The right side of the ear, the right ear was somewhat torn into this laceration as well. There were some four lacerations which varied from an inch to an inch and a half in the forehead. One was a "V" shaped laceration, that is two lacerations coming together to make a "V" and the other one was star shaped. These are peculiarities in the scalp the way it breaks from a blow to the scalp. The hair was burned off both temples. The eyes were black and swollen because of the smoke and let me interject this, the black eyes are the natural result of a skull fracture and do not necessarily represent a blow to the eyes themselves. There was a four to five inch "L" shaped laceration at the top and back of the head. There was a three inch "L" shaped laceration in the back of the head. There were burns over the body. There were first, second and third degree burns generally over the front of the body, both arms, hands, shoulders, chest, abdomen, flanks, thighs and legs. There was what appeared to be red paint. Some of the skin was burned and blistered and there was a residue, a gummy residue particularly on the left wrist, right wrist and right thigh. We examined some of this material under a low power microscope and found traces or pieces of red paint. We opened the scalp and the skull and looked inside the head. We found a fracture of the skull in the right temple. There was a massive concussion extending from the area of the right side of the head, right temple, all the way to the back of the head and dipped into the base of the skull. A portion of the brain was torn away and particularly in the front on the right portion, right frontal region. There was a generalized subarachnoid hemorrhage was seen over the covering of the brain. I examined the rest of the body and found evidence of carbon monoxide showing that the subject was surviving at the time of the burning. I don't see anything else in the report that would be of value in the discussion or in your questioning."
He expressed his opinion as to the cause of death as follows:

*618 "A. In my opinion, Mrs. Christian died as a result of a brain concussion as well as destruction of the vital areas of the brain as a direct result of blunt force injuries, that is being struck in the head with some sort of blunt object but she was alive during the fire but probably in a terminal state. She did breathe but was probable already in a moribund or dying condition when the fire took place."
The autopsy surgeon testified that the blood sample taken from the body of the deceased was negative for any trace of alcohol. He further testified that the deceased was in a moribund condition at the time her body was set afire, but that she was still alive. The autopsy was performed at about 1:15 p. m. on the day of the murder.
The investigating officers found broken glass and a lot of blood in and around the carport where the body was found. There is no doubt from the testimony in this record that the deceased was killed by appellant. Thus, the corpus delicti was proven beyond a shadow of a doubt and this fact is not disputed by appellant.
The officers arrested appellant and carried him to jail. Around 3:15 the officers got appellant out of his cell and took pictures of him and they also fingerprinted him. The photographs of appellant and the murder scene were introduced into evidence without objections.
The officer who fingerprinted appellant weighed over 200 pounds. Just before the officer fingerprinted appellant, he appeared to be calm, but after a few moments he grabbed the officer by the shoulders and lifted him off the floor exclaiming, "It is in my eyes. It is in the stars. I can see it in the stars. I can see it in the future." Appellant released the officer upon being requested to do so.
Mrs. Joyce Williams testified that appellant was her brother and that he was first admitted to Bryce Hospital in 1969. She further testified that he was a frequent resident of Bryce prior to the time of the commission of the offense. She also testified that he had a long history of mental illness and that on numerous occasions she had observed him talking back to characters on the television show "Bewitched." In addition she said that he occasionally described the appearance of dead relatives whom he had never met. She also testified that he often had delusions that he was a famous lawyer.
Mrs. Williams testified that appellant was in good condition and could live among "normal people as long as he took his medicine." She also stated that her mother, the deceased, had told her that she feared, "Billy would kill her if she tried to put him back in Bryce's."
Appellant's hospital records at Bryce's were introduced into evidence.
Dr. Jerold S. Lower, after being duly qualified as an expert psychiatric witness, testified that he was Chief Psychologist and Clinical Coordinator on the Forensic Program of Bryce Hospital. He stated that he had been treating appellant on a daily basis for the past 1½ years at the hospital. He said that appellant was suffering from schizophrenia, chronic, undifferentiated type. He also testified that appellant was often paranoic and psychotic. He stated that appellant felt that he was possessed by the devil and that he said he saw animals "coming down." Finally, this witness testified that in his opinion appellant did not know the difference between right and wrong at the time he killed his mother and was therefore insane.
Dr. James Thompson, after being qualified as an expert psychiatric witness, testified that he was a psychiatrist at Bryce Hospital for the past 13 years. He stated that he first examined appellant nine days after the homicide. He stated that during his examination of appellant he learned that appellant thought that his mother was an ape or a demon. That appellant was frightened of his mother and that is the reason he killed her. According to Dr. Thompson appellant was also suffering from delusions that his mother was not dead but was visiting relatives in Huntsville. He further stated that appellant's condition was diagnosed as schizophrenia *619 paranoid type. He said that in his opinion appellant was psychotic at the time of the homicide and that due to his diseased mind he did not know the difference between right and wrong and could not control his behavior.
Dr. James Morris qualified as an expert psychiatric witness and stated he was a psychiatrist at Bryce Hospital. He testified that he examined appellant within 10 to 14 days after the commission of the homicide. He stated that appellant exhibited behavior which he described as "flat affect" meaning that he was totally withdrawn, emotionless, etc., during interviewing. He said that appellant suffered from an inability to integrate his thinking regarding a single topic of conversation. This witness also stated that appellant was suffering from an acute schizophrenic disorder and often had delusions that his mother was still alive. Dr. Morris further testified that in his opinion appellant was psychotic at the time of the homicide and that he was out of contact with reality and was not responsible for his behavior.
Appellant's brother, Bobby L. Christian, testified that appellant had a history of mental illness and was often hospitalized for treatment. According to this witness appellant felt that people were out to get him. They were people of odd colors, red and blue, who listened in on him through microphones. He claimed these people formed a subversive world and that if people didn't watch out, the birds would attack. He stated that appellant thought every radio and television had hidden microphones and cameras that watched him constantly. This witness also said that appellant was often hyperactive and couldn't sleep at all for two or three days at a time. According to this witness appellant would first tell him that he was possessed of the devil and then assert that he was Jesus and that his mother was Mary. He further testified that his brother conducted conversations with the television set.
This witness also testified that appellant owned and drove his own car and at one time he was employed by the State High-way Department. That he had been married and had children but was now divorced.
David Christian, another brother of appellant, also testified that appellant had a prior history of mental illness which often required hospitalization. He stated that appellant told him that out-of-state gangsters were out to get him and that he had stabbed one of them. He said his brother had strange ideas on the way God works. That appellant also told him about the microphones everywhere and that these people were spying on him and that these people were red and blue. He related that appellant talked to the television set and stared at non-existent people in empty buildings. He further stated that appellant said he had seen a bunch of weird winged flying monsters attacking him. He thought his mother was one of these monsters. He said appellant made the statement that he saw little gods "falling" everywhere, and that even the jail bars were made up of little gods. Appellant also made the statement that he had a little ball in his head that was made up of these gods and they willed him to kill his mother. This witness said that appellant told him he would often see projections of his mother's face on the jail wall. Appellant told his brother that his problem had started out with drugs and he had gotten involved with drugs.
The record in this case reflects that there were several court orders pursuant to the provisions of Title 15, Section 425, Code of Alabama 1940, committing appellant to Bryce Hospital for observation and examination. The Superintendent and two members of his staff made reports to the Court from time to time to the effect that appellant was incompetent at the time of his admission to Bryce Hospital, and that he was incompetent at the time of the commission of the crime for which he stands charged, and recommended that he be detained longer in the institution as a patient for treatment and continued medication.
There were later reports from the hospital staff that, "after a period of examination, study, and observation, it is the opinion of the hospital staff that the said William *620 Macy Christian is presently sane and competent."
These reports would be followed by a Court order for the Sheriff of Tuscaloosa County to take appellant into custody and remand him to jail to await the further orders of the Court.
Another petition would be filed to recommit appellant to Bryce Hospital.
On April 25, 1974, appellant was examined at the Mental Health Center by Dr. J. S. Tarwater, for Superintendent of Bryce Hospital. Dr. Tarwater wrote a letter to the Public Defender of Tuscaloosa County in which he stated that appellant was pale, unshaved and not too communicative and that he had a past history of many admissions to Bryce Hospital and there was a history of intemperate use of alcohol as well as mental illness; that he appeared depressed about his mother's death and stated, "How will I get along without her. I don't see how I can and I have a long time to live." He told Dr. Tarwater, "The medicine is helping me." Dr. Tarwater stated appellant had a history of delusions and hallucinations at times. He quoted appellant as saying, "I thought my mother was an ape and I was seeing and hearing things." The diagnosis was, "Schizophrenia, chronic-undifferentiated type." The doctor recommended that he be sent back to Bryce Hospital for evaluation of mental illness.
Finally on May 5, 1975, the Board of the Lunacy Commission made the following report, in part:
"It is the unanimous professional opinion of the Board that Mr. Christian is not presently suffering from a mental disorder of sufficient severity to preclude his taking part in his trial and effectively assisting his counselor in his own defense."
On September 15, 1975, the Sheriff of Tuscaloosa County was ordered to take custody of appellant and remand him to jail pending further orders of the Court.
Appellant was put to trial on the indictment in October of 1975 upon his plea of not guilty and not guilty by reason of insanity.
Before the trial and out of the presence and hearing of the jury the Court took up the matter of the jury being sequestered with appellant explaining to him that with his consent the jury would be allowed to separate during the trial.
From the record:
"MR. CHRISTIAN: Well, that will be all right.
"MR. BURROUGHS: Be all right to let them go home?
"MR. CHRISTIAN: Yes, sir.
"MR. BURROUGHS: With proper warning from your Honor to warn them in this case not to speak to anyone or to discuss the case with anyone even the other jurors until they have heard all the evidence in the case.
"THE COURT: Mr. Christian, you are saying to me you agree to let them go home, is that right?
"MR. CHRISTIAN: Yes, sir."
Appellant claims that the trial court erred in overruling his motion for a new trial based upon the ground that the prosecutor committed prejudicial misconduct in his closing argument to the jury wherein he made the following statements:
1. They are saying (Bryce Hospital) that he was insane then but is probably competent to walk the streets of Tuscaloosa today.
2. But let me remind you that when he was released in 1971 he was ruled competent to live among normal people, and the next year he murdered his mother.
3. Ladies and gentlemen, I live in this town and you know what our problems are.
4. If you return a verdict of not guilty by reason of insanity against this man, this means this man is scot-free  free to walk the streets of Tuscaloosa again. (But the prosecutor went on to say, "The main issue in this case is whether this man should be held accountable for what he does.")
The record does not reflect that appellant made a single objection to a single statement *621 made by the prosecutor during his closing argument and counsel for appellant admitted this during the hearing on the motion for a new trial. He stated that he thought it best not to make an objection under the circumstances.
The trial court was most thorough in his oral charge to the jury. He covered every phase of the law applicable to the facts in this case. He charged the jury on all four degrees of homicide as well as the law of insanity. We take the following excerpt from the oral charge on the question of a verdict of not guilty by reason of insanity:
"Now, on the other hand, ladies and gentlemen, if you analyze the evidence in this case that has been presented to you and you are reasonably satisfied that at the time of the commission of the act charged that this defendant was legally insane as I have defined it to you, it would be your duty to find him not guilty by reason of insanity and then the matter would further actually be up to the Court." (Emphasis supplied.)
By this excerpt the Court was telling the jury that appellant would not be free to walk the streets of Tuscaloosa again. Any reasonable juror would, in our judgment, infer from the judge's charge that under the Court's jurisdiction and power appellant would be recommitted to Bryce Hospital for further proper treatment in accordance with the verdict of the jury. By no stretch of the imagination could the jury take the Court's charge to mean that appellant would be set free if the jury found him not guilty by reason of insanity.
It is a rule of long standing that objections must be timely interposed and an adverse ruling had from the trial judge before a legal question is preserved for appellate review. Conner v. State, 52 Ala. App. 82, 289 So.2d 650; Jackson v. State, 260 Ala. 641, 71 So.2d 825; Irons v. State, 42 Ala.App. 349, 165 So.2d 125; Embrey v. State, 283 Ala. 110, 214 So.2d 567; Smith v. State, 46 Ala.App. 99, 238 So.2d 898.
We do not consider the remarks of the prosecutor to be so prejudicial and grossly improper that they could not have been eradicated by the trial court upon prompt objections and instructions from the trial court to the jury to disregard such arguments. Alabama Digest, Criminal Law. 730(1)
When appellant's counsel made the statement on the hearing of the motion for a new trial that he made the determination not to object to the argument of the prosecutor this was an obvious attempt to entrap the Court in committing reversible error, but as we have said the statements made by the prosecutor were not so prejudicial and grossly improper that they were calculated to prejudice the jury even in the absence of an objection.
We have carefully searched the record for errors which injuriously affected the substantial rights of appellant, whether urged upon us or not, and have found none. This was a brutal murder of a woman who gave life to appellant and his deed and actions evidenced a cold stone heart. While he might have been temporarily out of his mind at the time he killed her, it was up to the jury to weigh and consider the credibility of the evidence and to determine if he was legally insane at the time of the homicide. The jury resolved that issue against appellant and he must pay for his crime.
The jury may reject all expert testimony though it is without conflict. George v. State, 240 Ala. 632, 200 So. 602; McAllister v. State, 17 Ala. 434, 52 Am.Dec. 180; Parrish v. State, 139 Ala. 16, 36 So. 1012.
The motion for a new trial was properly overruled. Clark v. State, 54 Ala.App. 217, 307 So.2d 28; Nichols v. State, 267 Ala. 217, 100 So.2d 750; Espey v. State, 270 Ala. 669, 120 So.2d 904.
The judgment of conviction is affirmed.
AFFIRMED.
HARRIS, TYSON and DeCARLO, JJ., concur.
BOOKOUT, J., dissents with opinion in which CATES, P. J., joins.
*622 BOOKOUT, Judge (dissenting):
Under our system of justice, juries are the triers of facts. Great weight is given to the verdict of a jury and appellate courts are reluctant to disturb their verdicts. We have many "boiler plate" propositions of law to this effect throughout our opinions, and the rule is based upon sound logic. Yet, upon proper application, an appellant may bring before an appellate court for review the sufficiency of the evidence.
Juries, though given broad latitude, are not given free and unbridled rein to completely ignore the evidence and arbitrarily arrive at a verdict contrary to every fact in the case. Only in the case of an acquittal can their verdict go completely unchallenged.
Neither the trial courts nor the appellate courts should allow arbitrary and baseless verdicts to stand solely because the crime charged is heinous or the community is aroused. Madmen sometimes commit heinous crimes, but the law of this state and the common law have always been that a madman is not responsible for his acts. The evidence here is overwhelming and uncontradicted that the appellant was insane at the time he killed his mother.
Insanity is an affirmative defense which must be established to the reasonable satisfaction of the jury. The leading case in this area is Pickett v. State, 37 Ala.App. 410, 71 So.2d 102, cert. denied 260 Ala. 699, 71 So.2d 107 (1954). Pickett recognizes the broad statement made by the majority in the present case, i. e. that a jury may reject expert testimony even though it is without conflict. The court in Pickett went on to say that expert testimony must be weighed by the jury like other evidence and may not be arbitrarily ignored.
The evidence in Pickett regarding the defendant's insanity was, as in the present case, overwhelming and uncontradicted. In ordering a new trial, the court in Pickett, citing Boyle v. State, 229 Ala. 212, 154 So. 575 (1934), held as follows:
"`Cases of insanity may be so clear, the proof so strong and undisputed, that the jury should be instructed in like form.'"
There were two factors which Pickett alluded to in reaching the above decision. First, there was no evidence that the defendant was sane. As the defendant's testimony consisted of entirely incoherent mumblings, the jury did not even have an opportunity to form an estimate of his mental condition. The presumption that every man is sane was also rebutted in the present case. There was no evidence presented which tended to show that the appellant was sane. In fact the appellant did not even testify.
The second factor which the court in Pickett mentioned was the trustworthiness of the evidence concerning that defendant's insanity. The court in Pickett, citing Howard v. State, 172 Ala. 402, 55 So. 255 (1911) reasoned as follows:
"`It is not a case where the testimony was limited to the friends of the family or relatives of the defendant, who sought to shield the family from disgrace; but it is a case where a large number of witnesses, without any apparent interest or bias, all agree that the defendant before, at the time of, and after the commission of the alleged offense was, and continued to be, insane, and that he was mentally irresponsible. Under such circumstances, can it be said, * * * that there is any evidence in support of defendant's sanity?'"
Certainly there is no reason to suspect that the three psychiatrists, who testified in the present case, had any bias or an interest in the appellant's cause. While it is true that relatives of the appellant also testified to his insanity, it is obvious that any bias or interest on their part was negated because they were also relatives of the deceased. There was no basis upon which the jury could reject the overwhelming and uncontradicted proof of the appellant's insanity.
The majority cites George, McAllister and Parrish for the proposition that the jury may reject all expert testimony though it is without conflict. It should be pointed out that all three cases were reversed on other grounds thus relegating the proposition to *623 gratuitous dicta. The opinion in McAllister does not reveal the basis for that defendant's contention of insanity nor does it set out on what basis the jury reached its conclusion of sanity. George and Parrish, however, reveal that the juries had before them sufficient evidence from which they could infer that those defendants were sane.
The jury may reject all expert testimony though it is without conflict. The jury may do so if the testimony is weak, subject to bias or interest, unclear, or if there is another basis upon which to believe a defendant sane. Expert testimony does not pretermit the issue of insanity and such testimony may be rejected but it may not be ignored for no reason at all. The highly prejudicial remarks made by the State's attorney in his closing argument are obviously not grounds upon which a jury may reject the overwhelming and uncontradicted evidence pointing to the appellant's insanity.
I therefore respectfully dissent.
CATES, P. J., joins in this dissent.