Patricia Bullard was indicted and convicted of "assault in the first degree" in violation of § 13A-6-20, Code of Alabama 1975. After a pre-sentence hearing the trial court fixed punishment at twenty years' imprisonment.
On June 16, 1980, the appellant shot several rounds from her .32 caliber pistol into *Page 165 
Jack Leavelle's automobile, injuring Mr. Leavelle, his wife, and their grandson. There was no dispute at trial that the appellant committed this unprovoked attack.
 I
Appellant's sole defense was that she was "not guilty by reason of insanity." Consequently, her only contention on appeal is that the jury's verdict was contrary to the weight of the evidence establishing this insanity defense. The pertinent facts are set out below.
The appellant, Patricia Bullard, had a history of mental and emotional problems. On two prior occasions she had been admitted to Bryce Hospital in Tuscaloosa for treatment. She had been involved in two earlier shooting incidents where on separate occasions she shot her grandmother and her husband. The former incident dated back to 1969 and corresponded to her first commitment to Bryce Hospital.
The appellant was known to have a quick and violent temper, often "set off" by emotional problems. By appellant's own admission she was an alcoholic. When she drank, her temper was even worse.
Several months before this shooting incident, appellant had moved into a trailer on the property of her friends, Jack and Stella Leavelle. Earlier, she had separated from her husband, Herbert Bullard, but he still visited or telephoned her at the trailer several times a week. A few months before the shooting, appellant's two daughters and her granddaughter moved into the trailer with appellant. However, both daughters had moved out before the shooting because they "couldn't really get along" with their mother.
Before and after her daughters and granddaughter moved out, the appellant began to have problems that she blamed on Jack Leavelle. Her trailer was situated on the bank of a lake that was infested with snakes. Appellant was afraid the snakes would harm her granddaughter and accused Mr. Leavelle of placing them in the lake. One day the appellant found some broken glass behind her automobile and accused Mr. Leavelle of trying to sabotage her car. A few nights before the shooting someone wrote "H E L L" on the highway at the entrance of her driveway and appellant blamed that on Mr. Leavelle or his grandson. On another occasion appellant thought that Mr. Leavelle had intentionally tried to back his car into her granddaughter. Having attributed all of these problems to Mr. Leavelle, she consequently blamed him when her second daughter and granddaughter moved out of the trailer for the last time.
On the Saturday before the shooting, the appellant kept her granddaughter for the day. When she took the baby home to her mother, appellant pleaded with her daughter to move back to the trailer. Late Sunday afternoon appellant's daughter called her and for the last time refused to move back with her.
Appellant began drinking for the first time in two and a half years and that night consumed a fifth of wine and four beers. She got little sleep that night and consumed six more beers the next morning.
Later that morning, Monday morning, she picked up her husband at work and drove him to a local store where he bought her a box of ammunition for her .32 caliber pistol so she could "shoot some snakes."
On Monday afternoon Mr. Leavelle, his wife and their grandson passed appellant on the highway near their home. When appellant stopped quickly, Mr. Leavelle stopped too, because he had seen the appellant drive by his home earlier and thought that she was looking for his wife. After stopping, he backed his car down to hers to see what she wanted. The appellant walked over and chatted briefly about her daughters and the fact that they had moved out of the trailer for good and then, without any warning or indication that she was upset with the Leavelles, she walked back over to her automobile and picked up her .32 caliber pistol. As she walked back towards the Leavelles' car she exclaimed, "I'm tired of people s h i _ _ _ _ _ on me." She pulled the gun up and fired several times, wounding *Page 166 
Mr. Leavelle in the arm and chest, wounding Mrs. Leavelle in both legs, and wounding their grandson in the hip.
The appellant then left the scene. She was spotted later by a sheriff's deputy, who immediately gave pursuit. She lead this law enforcement officer on a high-speed chase before she was eventually apprehended.
Most of the evidence of appellant's insanity prior to the shooting came from the testimonies of her husband, Herbert, and her two daughters. They all testified that the appellant was "not in her right mind" for several days leading up to the shooting.
Appellant also produced expert testimony that she was insane. Dr. Robert A. Rose, a clinical psychologist employed by the East Alabama Mental Health and Mental Retardation Center, testified that his examination of appellant eleven days after
the shooting revealed that she was then suffering from "paranoid schizophrenia." He concluded that this condition was consistent with the shooting incident.
The prosecution elicited testimony that in spite of their contentions that the appellant was insane, none of her relatives sought medical assistance for the appellant prior to the shooting. In fact, one of her daughters allowed the appellant to babysit for her granddaughter the Saturday before the shooting and Mr. Hubbard purchased a box of ammunition for the appellant on the day of the shooting. The state asserts that these factors along with such facts as that the appellant had been drinking just prior to the shooting, and fled right after the shooting contradict the evidence of insanity. Moreover, the state points out that Dr. Rose admitted on cross-examination that individuals suffering from "paranoid schizophrenia" may, nevertheless, be able to distinguish right from wrong, and that fleeing the scene of a crime would suggest that the perpetrator knew he had done something against the law. (R. 173). Lastly, the state points to the testimony of the Leavelles, the only people who viewed the appellant at the time of the shooting. It was their testimony that other than appearing a little upset that her daughters had moved out of her trailer, the appellant was "acting normal" up until the time she pulled the gun out and began shooting. Until then the appellant had had a normal conversation with them and gave no indication of what she was about to do.
At the conclusion of the evidence, the trial court properly instructed the jury on the issue of insanity. The jury's verdict of "guilty" indicates that they were not persuaded that appellant was insane at the time of the shooting.
 II
The law in Alabama regarding the defense of insanity, although not always easily applied, is clearly stated in §13A-3-1, Code of Alabama, 1975, as follows:
 "(a) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.
 "(b) `Mental disease or defect' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.
 "(c) Lack of criminal responsibility under this section is a defense." (Emphasis added)
The determination that an individual, because of his mental disease or defect, either cannot distinguish right from wrong or, knowing right from wrong, cannot resist criminal conduct, is one which must be made by the jury from a consideration of all the evidence in each case. Section 15-16-2, Code of Alabama 1975; Christian v. State, 351 So.2d 623 (Ala. 1977), and cases therein cited; Graham v. State, 383 So.2d 892 (Ala.Cr.App.), cert. denied, 383 So.2d 895 (Ala. 1980); Bowen v. State,386 So.2d 489 (Ala.Cr.App.), cert. denied, 386 So.2d 492 (Ala. 1980).
In making its determination, the jury must begin with the presumption that the appellant is sane. Section 15-16-2, supra; *Page 167 Christian, supra. It, thus, becomes the defendant's burden, throughout the course of the trial, to prove to the jury by a "preponderance of the evidence" that he was insane at the time of the crime. Christian, supra; Graham, supra; Bowen, supra; This burden is not overcome by expert testimony of the defendant's insanity alone, because the jury need not consider such testimony as conclusive. Pickett v. State, 37 Ala. App. 410, 71 So.2d 102, cert. denied, 260 Ala. 699, 71 So.2d 107
(1954); Bowen, supra. Consequently, the jury in the instant case was justified in weighing the testimony of Dr. Rose, the clinical psychologist, just like all the other evidence presented.
We have reviewed the record on appeal and have concluded that for aught that appears the jury properly weighed the evidencepresented and returned a verdict that cannot be labeled "arbitrary" or "patently erroneous." Moore v. State,364 So.2d 411 (Ala.Cr.App.), cert. denied, 364 So.2d 416 (Ala. 1978);Bowen, supra.
We concede that this is a close case. However, it is apparent that the appellant did not clearly and conclusively establish her insanity at the time of the shooting to the jury's satisfaction. She did not overcome the burden of proof with the evidence presented.
It is true that a few similar convictions have been reversed because "there was apparently nothing before the jury to rebut the great mass of testimony directly showing actual insanity before, at the time of, and after the act in question." Herbertv. State, 357 So.2d 683 (Ala.Cr.App.), cert. denied,357 So.2d 690 (Ala. 1978), and cases therein cited; Christian, supra. In these cases the initial conviction was based solely on the "presumption of sanity."
However, the jury in this case had ample facts from which to draw an inference that the accused was in fact sane. Graham v.State, supra. The jury heard the testimony of the victims that the appellant appeared normal until she pulled out the gun and started shooting. The jury knew that appellant's husband, who testified that she was insane, nevertheless, bought her a box of ammunition on the day of the shooting. The jury heard the sole expert witness, Dr. Rose, testify that the appellant, despite her mental condition, could have had the ability to determine right from wrong. They also heard him say that her flight from the scene of the shooting indicated that she indeed knew she had done something wrong. And most importantly, the jury was afforded the opportunity of viewing the appellant on the witness stand. They, therefore, had ample information from which to draw their conclusion as to appellant's sanity. We believe this to be correct.
This case is due to be and is hereby affirmed.
AFFIRMED.
All the Judges concur.