A jury found appellant guilty on a trial on an indictment that charged in pertinent part that defendant:
 ". . . being sixteen years of age or older, did subject to sexual contact ______________ [a named female whose name is not here given, in justice to her], who is less than twelve years of age, in violation of § 13A-6-66 (a)(3) of the Code of Alabama."
Said subsection of the Code provides:
 "A person commits the crime of sexual abuse in the first degree if:
 "He, being sixteen years or older, subjects another person to sexual contact who is less than 12 years old."
Section 13A-6-66 (b) provides that "Sexual abuse in the first degree is a Class C felony." By § 13A-5-6 (3) the punishment prescribed for a Class C felony is "not more than 10 years or less than 1 year and 1 day." The court sentenced defendant to imprisonment for 10 years.
The term "sexual contact" as found in § 13A-6-66 (a)(3) is defined in § 13A-6-60 (3) as follows:
 "Any touching of the sexual or other intimate parts of a person not married to the actor, done for the purpose of gratifying the sexual desire of either party."
Appellant challenges the constitutionality of the quoted subsections of the Code as "unconstitutionally vague, ambiguous and indefinite."
We find no valid criticism of the term "sexual . . . parts" of the statutory language. Any normal person sixteen years of age or older should and would know the meaning thereof. The term "or other intimate parts" is troublesome, but the language as a whole is sufficient to have advised the defendant that it included a part of the child that the evidence shows the defendant touched, i.e., her vagina. We think also that appellant's criticism is too severe of "any touching" in arguing that it could include "the touching of another person's clothed body with an object held or manipulated by the actor." The touching must be construed in the light of the qualification that it be "done for the purpose of gratifying the sexual desire of either party." We do not agree with appellant that the language "done for the purpose of gratifying the sexual desire of either party" is not sufficient to apprise defendant of the offense proscribed.
At the conclusion of the State's evidence and just after it announced that it rested, defendant moved to exclude the evidence. At that time, the alleged victim, a girl six years of age, had testified, and a stipulation had been entered into between the parties as to the proposed testimony of another girl about the same age, who was with the alleged victim at the time and place of the occurrence. According to the stipulation as found in the transcript, the two girls "were on their way home from school . . . they were in an apartment complex *Page 187 
general area . . . a man approached them and asked them to go behind a building to allegedly look at some squirrels or rabbits, that once behind that building the man pulled down their pants and touched the genital area of both of them and that when one girl cried . . . the man fled the scene." A detective had testified prior to the motion to exclude the evidence that defendant had made a statement identifying himself as the person with the girls at the time and place of the alleged crime. Such statement was admitted in evidence after its voluntariness and all requirements for the admission of a confession had been established. Appellant does not question the admissibility of the statement. We think the evidence indicated was sufficient; it was substantial evidence that defendant had committed the crime charged in the indictment. The court was correct in overruling defendant's motion to exclude the evidence.
The court refused two charges requested in writing by defendant, one with hypothesis and one without hypothesis, that the jury should return a verdict finding defendant not guilty by reason of insanity. The court also overruled defendant's motion for a new trial grounded in part upon the claim that the evidence was so greatly in favor of defendant on his plea of not guilty by reason of insanity that a new trial should be granted. Appellant's contention that the court was in error in its rulings presents an extraordinarily difficult question. Before discussing the evidence pertaining to whether defendant was sane or insane at the time of the commission of the crime, we note a change in the language as to what constitutes legal insanity that prevailed before the adoption of the present Criminal Code of Alabama (Code of Alabama 1975, Title 13A, effective January 1, 1980), which was prior to the crime involved in the instant case. Prior to January 1, 1980, and pursuant to Parsons v. State, 81 Ala. 577, 2 So. 854 (1886), the rule was established that an accused could successfully plead insanity if he:
 ". . . was so affected by disease of the brain when the offense was committed as to render him so insane that he did not know right from wrong with respect to the particular offense charged, or by reason of such mental disease he could not resist doing the wrong; and the crime must have been the product solely of such disease of the mind."
The quotation is from the Commentary to Code of Alabama 1975, §13A-3-1, for which it cites the following authorities: Streeterv. State, 278 Ala. 272, 177 So.2d 826 (1965); Aaron v. State,271 Ala. 70, 122 So.2d 360 (1960); Lee v. State, 265 Ala. 623,93 So.2d 757 (1957); Lakey v. State, 258 Ala. 116, 61 So.2d 117
(1952); Parsons v. State, 81 Ala. 577, 2 So.2d 854 (1886).
Alabama Code 1975, § 13A-3-1 provides:
 "(a) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.
 "(b) `Mental disease or defect' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.
 "(c) Lack of criminal responsibility under this section is a defense. (Acts 1977, No. 607, § 501.)"
Code of Alabama 1975, § 15-16-2, which has been the codified law of Alabama since 1896 has not been changed. It provides:
 "Every person over 14 years of age charged with crime is presumed to be responsible for his acts, and the burden of proving that he is irresponsible is cast upon the accused. The defense of insanity in all criminal prosecutions shall be clearly proved to the reasonable satisfaction of the jury."
In contending that defendant fully met the burden of proof upon him and that the evidence was so strong and conclusive that defendant was insane at the time of the commission of the crime that the verdict should not stand, appellant relies heavily upon Christian v. State, Ala. 351 So.2d 623 *Page 188 
(1977); Herbert v. State, Ala.Cr.App., 357 So.2d 683 (1977), cert. denied, Ala., 357 So.2d 690 and Sasser v. State, Ala.Cr.App., 387 So.2d 237 (1980), cert. denied, Ala.,387 So.2d 244. In each of the cases, it was held that the trial court should have charged or directed the jury to render a verdict finding the defendant not guilty by reason of insanity. To those cases so holding, can be added a fourth. Pickett v.State, 37 Ala. App. 410, 71 So.2d 102 (1954), cert. denied, Ala., 260 Ala. 699, 71 So.2d 107.
Three highly qualified psychiatrists, two employed by defendant and one employed by the State, testified as witnesses called by defendant. No psychiatrist, or other professional in the field of medicine, testified as a witness for the State. Each of the psychiatrists testified in effect that it was his opinion that at the time of the commission of the alleged crime and "as a result of mental disease or defect" the defendant lacked "substantial capacity . . . to conform his conduct to the requirements of law" or, as one of them stated, there was an "irresistible impulse" to commit the particular kind of crime that he committed in the instant case. None testified that he lacked "substantial capacity to appreciate the criminality of his conduct." The psychiatrist who had interviewed and treated the defendant over a much longer period of time than either of the other two psychiatrists testified:
 "Q. Did you discuss with him the offense with which he was charged?
"A. Yes, I did.
 "Q. What did he say to that, how did he respond to what he was charged with?
"A. He felt pretty embarrassed about it.
"Q. Embarrassed?
"A. Yes.
"Q. Did he recall the incident?
"A. He did.
"Q. Did he relate those incidents to you?
"A. He related several of them to me.
 "Q. Was there any type of pattern or, I had to use the term modus operandi, or M.O., was there a basic pattern in the relation of those incidents as he related them to you as to how those incidents occurred?
 "A. There seemed to be a connection between the amount of stress he was under at any given point in time and the frequency of occurrence.
 "Q. And that would go to the point that they occurred or his first problem according to his family history occurred when he was eighteen and then again in '72, I believe and then earlier this year?
 "A. Seemed to have been something of a chronic nature that sometimes (sic) more frequently than others.
 "Q. The incidents themselves, was there any similarity in the incidents, in the way they occurred and the persons involved with them?
 "A. Well, they were generally, well, of course, they were all young girls, generally between the ages of, I think, the youngest might have been two or three, the oldest around six or eight, and frequently there was some sort of initiation made on the part of the Defendant towards the little girls, some sort of seductive ploy, such as offering them a toy, or wanting to talk to them about something, or something along that line.
 "Q. Would asking them if they had to go to the bathroom be [a] familiar phrase he would use in each of these incidents?
"A. Yes.
 "Q. Did the girls being alone or an attempt by him, an overt attempt by him to isolate the young girls, would that be a recurring fact of it?
"A. Yes, I'd say so."
There was undisputed evidence that during the three months that defendant was under continuous daily observation by medical personnel, including the psychiatrist who was the principal witness for defendant on the issue as to his insanity, defendant was thoroughly checked, and tested for physical and mental trouble. His principal medical witness testified: "Well, the conclusions reported to me were that all the tests were within normal limits and that there was no evidence of any organic pathology." Radiological tests included an *Page 189 
electroencephalogram. He repeatedly used the term "personality disorder" as expressive of his diagnosis of the defendant. He testified that according to the Weschler Adult Intelligence Scale, the "Draw A Person Test, Bender Gestalt Test, the Rorschack and the Sentence Completion Test" defendant had a "normal I.Q." There was also interspersed in his testimony, as well as in other evidence presented by defendant on the issue raised by his plea of not guilty by reason of insanity, the diagnosis of his trouble as "pedophilia," which we understand, by the aid of dictionaries, to mean "erotic love" of an adult for children, which is derived from Eros, the pagan god of love of ancient Greece.
There was evidence of statements made by defendant after he was arrested as to some experiences he had recently had with other children similar to what occurred in the instant case. In defendant's statement as to one of such incidents, he said: "I did not orgasm, I only got an erection."
There was evidence other than testimony of the psychiatrists, from other highly credible and respected witnesses, including a preacher and a college professor who had for a long time observed defendant, to the effect that it appeared to them that there was "something wrong" mentally with defendant, that he was "shy and quiet," that he did not have many friends, that he had difficulty in expressing himself and that he was "antisocial."
It is to be observed from the testimony of the expert witnesses, particularly the psychiatrist who had professionally studied first hand the defendant for a long period of time, that their opinion that at the time of the crime he "lacked substantial capacity . . . to conform his conduct to the requirements of law" was not dogmatic. By saying this, we do not mean to imply that generally dogmatism of an expert witness increases the value of his opinion. Often the reverse is true. Much depends on the circumstances. For instance, an expert witness as to the value of property could be expected to show strength of conviction that the reasonable market value of the property was not more than an amount stated, or, on the contrary, that it was not less than a stated amount, but, when giving his opinion as to what would be the reasonable market value of property, his recognition that other experts would differ with him as to the value would probably cause his opinion as to value to be expressed with less certitude and positiveness. This lack of positiveness, as commendable as it is, is to be noted in the testimony of the psychiatrist who had the best opportunity to analyze defendant's condition, in answer to some questions asked him on direct examination as follows:
 "Q. All right, sir, knowing all of that and being a doctor specializing in the field of psychiatry, I will ask you this: Was he in May of 1980 able to conform his conduct to the requirements of the law — that is the requirements of the law that he not going around putting his hand on young girls' vagina — was he able to conform his conduct to the law, that law?
"A. I do not feel that he was.
 "Q. Did he have or lack the substantial capacity to conform his conduct to the requirements of our law?
"A. I feel that he did.
"Q. He lacked that capacity?
"A. That is correct, yes.
 "Q. And at the time that he was doing these acts, assuming that he did them, was he then suffering from a mental disease or defect?
"A. I feel that he was."
Our review of the evidence leads to the conclusion that, although the evidence is convincing that defendant was "suffering from a mental disease or defect," it is not as convincing that "as a result of mental disease or defect" defendant lacked "substantial capacity . . . to conform his conduct to the requirements of law" as set forth in Code §13A-3-1 (a). Furthermore, whether any lack of substantial capacity to conform his conduct to the requirements of law was a result of mental disease or defect is made doubly questionable in the light of the statutory qualification of such mental disease *Page 190 
or defect by Code § 13A-3-1 (b), that mental disease or defect "does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."
Some, if not all, reasonably minded persons could conclude from all the evidence in the case, which is generally the test whether a jury question is presented on any issue of fact even though the evidence is undisputed, that defendant as a result of mental disease or defect did not lack substantial capacity to conform his conduct to the requirements of law at the time the crime was committed. It was well within the fact-finding province of the jury to conclude that whatever irresistible impulse defendant may have had to commit the crime, or whatever incapacity he may have had to conform his conduct to the requirements of law, was not the offspring of any mental disease or defect but from baser passions of mankind, which had degenerated to unnatural lust, and that the practice thereof is controllable by every person who has the mental capacity to distinguish right from wrong, which the appellant had, according to all the evidence. It would have been an invasion of the province of the jury for the trial judge to have decided the pivotal issue in the case, instead of leaving a determination thereof to the unanimous verdict of the jury.
Among the grounds of defendant's motion for a new trial was an averment that the "District Attorney's Office made an agreement with the attorney for the defendant" and that the "District Attorney's Office did not live up to said agreement." The record indicates that this ground, as well as all other grounds, was taken into consideration by the trial judge who could well have been cognizant of the facts upon which such assertion was based, but we are not. This leaves the matter beyond our power to determine correctly, and we do not attempt to do so.
There was a ground in defendant's motion for a new trial that charged that "the District Attorney's office deliberately caused to be in the presence of the jury panel a number of other children, and their parents, who were called as witnesses in other cases against this defendant that were not being tried at the time this case was being tried" and that "said action by the District Attorney's office was a deliberate attempt to prejudice the trial jury against the defendant and was highly improper and prejudicial to defendant's right to a fair trial." In the ground of the motion there was also the averment, "This matter was brought to the attention of the Court during the course of the trial." The transcript contains a reference to the alleged matter and shows that to some extent, at least, it was "brought to the attention of the Court during the course of the trial." However, nothing is shown in the record proper or in the transcript that is sufficient for us to determine therefrom that such ground of the complaint was substantiated.
We find from the record proper and the transcript of the proceedings that there was no error prejudicial to defendant. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby
AFFIRMED.
All the Judges concur. *Page 191