Appellant-defendant was indicted for murder in the first degree. At arraignment, in the presence of counsel, appellant entered a plea of not guilty and not guilty by reason of insanity. Following a trial by jury, appellant was found guilty: the court (not the jury) duly adjudged him guilty and sentenced him to life imprisonment. He appealed.
Appellant was an indigent. Appointed counsel at nisi prius represents appellant on this appeal. *Page 1179 
Defendant filed a motion for a new trial which the court overruled. The motion asserted inter alia: (1) that this verdict is contrary to the evidence in the case; (2) that the verdict is contrary to the "way" [sic] of the evidence in this case; and (3) for the verdict of the jury disregards the testimony of Dr. J.W. Glaister and Dr. Joseph Woddail, which testimony was not rebutted by any witness. The ruling of the court on this motion is the subject of appellant's contention for reversal of the judgment and remand of the cause.
We think evidence pertinent to this issue should be delineated in reasonable detail to the end that the mental condition of defendant on the date of the homicide (May 29, 1976) may appear.
The deceased victim was Wanda Randolph, a ten-year-old black child. Defendant was a black man sixty-three or sixty-four years of age at the time of the homicide.
It appears that defendant was acquainted with the victim sometime before May 29, 1976. On that date he came to her house in the daytime when both of her parents were away.
Betty Jean Randolph (the victim's sister), fourteen years of age, testified that she and her six-year-old brother James were at their home on Gaines Street in the early afternoon of May 29, 1976. At that time, Betty Jean testified, defendant came to the front door and said, "I caught you, I caught you." When the children saw that appellant had a knife in his hand, they fled to their grandmother Reynolds' house a short distance away. Defendant followed right behind them. Betty Jean further testified when she arrived at the house, her two sisters Mattie and Wanda were on the porch, "but they just run on in, didn't pay any attention to me." All four children then entered the house and walked through it to the bathroom where two plumbers were working on the fixtures.
Betty Jean also testified that at this time she told Mattie and Wanda, who were standing in the door, that "Jacob (defendant) was after me and my brother with a knife and I heard him step on the porch." When she heard the footsteps on the porch, she and her brother hid behind "the orange chair" just outside the bathroom. From that vantage point, Betty Jean saw defendant enter the house and heard him say, "I caught you, I caught you." Appellant then went into the bathroom. Betty Jean left her hiding place telling her brother to stay behind the chair. After saying, "I caught you, I caught you," defendant slapped Wanda. Wanda screamed. She fell into the bathtub on her back. Betty Jean then saw defendant pull a knife with his right hand. Mattie ran and Wanda screamed for help. Defendant ran out into the yard with his knife in his hand. Betty Jean testified that defendant ran down the road and "told me he was going to kill me."
On cross-examination, Betty Jean stated that about a day before the trouble happened, defendant accused her of going with white boys. This happened at the house of witness. She said defendant acted "kind of normal like."
On re-direct, witness testified that neither she nor her sisters had been going around or playing with white boys.
Mattie Randolph testified that just before the incident she was at the home of her grandmother, Willie Reynolds. She got a key and admitted some plumbers into the house of her grandmother. This was done at her grandmother's request who was at work.
Defendant came to the bathroom and said, "I caught you, I caught you." Witness then crawled under his arm and he said, "I caught you, I caught you." Witness did not see what happened.
James Randolph, father of the children (Wanda, et al.) called by the State, testified on cross-examination that, on an occasion prior to the incident, defendant came to his house and "accused them (my children) of things and I told him not to come back no more." Woods told him that he had seen a bunch of boys hanging around them. He told defendant he was wrong. Woods told him that he "would be sorry." He did not notice anything unusual about defendant. *Page 1180 
John Wilburn, State Toxicologist, testified that Wanda's death "was due to a hemorrhage, which was associated with the stab wound of the chest."
Stratt Barnes, the plumber working in the bathroom, testified that the defendant slapped Wanda into the bathtub and then hit her again. Defendant then acted like he was going to pick her up, but instead he stabbed her with a knife which Barnes did not see until defendant pulled it out. Defendant wiped the knife off and then backed out the door. The fatal incident occurred in about ten seconds. Barnes assisted the wounded child who died right away. Defendant ran.
P.J. Hargett testified as a witness for the State. He was the plumber's helper in the bathroom where the homicide occurred. This testimony was about the same as the plumber's.
John Robinson, a city policeman in Russellville where the incident occurred, stated he first went inside the house and then went outside and saw a man running down a gravel road hollering he was the one that killed the little girl and that he stabbed her. The man, Robinson testified, told him that he had told her to quit running around with white kids. He also stated that the defendant said the knife was in his left inside coat pocket, and it was then retrieved by Officer Gaba. Robinson testified that he had not noticed anything unusual about defendant.
Mike Gaba, a Russellville police officer, was next put up by the State. He testified about defendant running toward him and Officer Robinson. He also testified that defendant said ". . . I killed her, I told her not to mess around with those white boys." He also told about finding the knife on defendant's person. He noticed nothing unusual about defendant's appearance.
Terrell Potter, an investigator for the District Attorney's office, was the State's next witness. He testified about taking some photographs at the scene. These were admitted in evidence. He also took a photograph of the victim's wound on her body.
Officer Burns Saint testified for the State about the lab in Florence.
The State then rested.
The defendant called Dr. Joe Woddail as a witness. Dr. Woddail was a physician with a specialty in psychiatry at Bryce Hospital for four and one-half years. Dr. Woddail was a member of the Forensic Board at Bryce Hospital. This Board evaluates mental patients at Bryce who are charged with crimes and sent to Bryce for examinations. Dr. Woddail was also a consultant to the Board. He examined defendant who was sent there by the court.
The Board was composed of Marie Robinson, a social worker; Margaret Kay Witt, a psychologist, with a master's degree; Annette Brodsky, who has a Ph.D. in psychology; Patricia Larkins, who has a master's degree in psychology, and Dr. Woddail.
Dr. Woddail further testified that "when a person is admitted to the Forensic Program, he would first get a physical examination by a general physician. I would do a mental status examination, the social worker would get a history from the patient's family or from the patient and from the family and from any other reliable source that they would obtain information from and the psychologist would perform psychometric tests and after we got all this data together, we would try to make an evaluation."
An evaluation was made of defendant.
 "Q What determination did the Board reach concerning Mr. Woods?
 "A Well the first time, we met on October 6, 1976, there was an opinion of the Board as a whole that further information was needed to arrive at an opinion and then on November 10, it was determined that he was not competent to stand trial at this time.
 "Q Did you, as a Psychiatrist, make a determination as to what condition he was suffering from?
"A I did.
 "Q What did you decide, in your professional opinion, he was suffering from?
"A Schizophrenia Paranoia. *Page 1181 
"Q What do you mean, when you say Schizophrenia?
 "A Well, it's a similar term that we use instead of using the word psychosis or a legal term, which is insanity. As far as we're concerned, they are all the same thing. Now, Schizophrenia paranoid type is a specific type of a major mental illness or a psychosis, depending on what the person's symptoms are. In his case, he had two major symptoms that persisted in this diagnosis. One, he was withdrawn and cut loose from reality. The other was an over suspiciousness. Now when I say over suspiciousness, I'm not talking about normal suspiciousness in his relationship with the people there and me and his relationship that he discussed in his community and some of his beliefs, which could not be changed, were so exaggerated and suspicious in manner until it just fitted the criteria of paranoid schizophrenia. Had his illness progressed a little further, he would have —
 "MR. JOLLY: I object to had his illness progressed any further and to what there might have been.
"THE COURT: Overruled.
 "A He would have had, in my experience, illusinations (sic) which is voices talking to him or saying things that weren't really there and this is what I stated in my Mental Status Examination. It was very difficult to make this decision, at that time, as to whether he was responding to voices that weren't there. I could not elicit this in a definite manner, so I left it out. Now, the other part of further development paranoid schizophrenia would be delusions, delusions of grandeur or of persecution. He had over suspiciousness very similar to delusions of persecution, to-wit, or what I'm trying to say, everybody was against him, at that time. What he talked about mostly was the white race, but at the same time, he, also, was very suspicious toward the black race.
 "Q You said he had exaggerated suspicions. Can you give us some examples of these exaggerations, he mentioned to you?
 "A As I mentioned he felt and he described as he talked about himself and experiences in the past months or year or so, that all of the white people were going to harm him. They were against him and he had to be continually on the defensive that they didn't harm him or destroy him and then, I added we talked some about the black race and it was sort of a global illness that had invaded his people.
 "Q Are these fears real to a person in that condition?
"MR. JOLLY: Objection, Your Honor.
"THE COURT: Overruled
"A Oh yes.
 "Q If there was testimony in this case that the defendant thought that the victim was having an affair with some people that didn't exist, would this be compatible with his condition as you found it when you examined him?
"A Yes.
"Q That would be this over suspiciousness at work?
"A Yes.
"Q When did you first see Mr. Woods?
 "A Now this admission says September 23, 1976, is when he was admitted.
"Q You would have seen him shortly after that?
 "A I'm sure I saw him several times, shortly after that.
 "Q Doctor, in your opinion and based on your experience and the study you have made of this defendant, was his mind so defective mentally, at the time you saw him, as to destroy his power of choice between right and wrong and his free agency destroyed to such an extent that he was incapable in avoiding the act in question at the time?
* * * * * *
"A That would be my opinion.
 "Q And do you have an opinion, as to how long this condition had existed in the man?
 "A I have already mentioned for many months or for at least a year or two. *Page 1182 
"Q What became of Mr. Woods at Bryce Hospital, after
the Forensic Unit made its determination?
 "A After he left the Forensic Unit, he was referred to one of the other four regions, which was Region 3, for further treatment.
 "Q Was Mr. Woods placed on drugs for his mental condition, while he was at Bryce Hospital?
"A He was.
 "Q Would you tell us what drugs were prescribed for him?
 "MR. JOLLY: Objection, Your Honor, I don't see that has anything to do with his mental condition, on June 29, 1976.
"THE COURT: Overruled.
 "A At Bryce, he was placed on Sinequan, which is a psychic stimulant, which is supposed to help people who are depressed. He was placed on Haldol, which is one of the tranquilizers we give for psychosis, such as schizophrenia.
 "Q Were these drugs consistent with the diagnosis you made of paranoid schizophrenic?
 "A These drugs are the drugs given for paranoid schizophrenic."
The witness further testified on re-direct:
 "Q Now Mr. Jolly was concerned about Mr. Woods fainting symptoms of paranoid schizophrenia. Would that be possible?
"A I don't think so.
"Q Why?
 "A Well the best way I can answer that is what I tried to answer just now. After 35 years of experience in this field, I don't think anybody could fool me. I don't think that's bragging at all. I think anybody that has spent this much time in the field, if they haven't learned that in 35 years, they would be retarded."
The defendant next called Joe Gilliland. This witness was appointed attorney for defendant, but obtained permission to withdraw because he had been appointed District Judge of that county.
We quote questions and answers as follows:
 "Q Did you have occasion to meet with Mr. Woods and discuss with him the crime with which he was charged?
 "MR. JOLLY: I object to that. I object to any testimony concerning his discussions with the defendant, as involving the attorney-client privilege.
 "THE COURT: I think that's for the defendant to claim, Mr. Jolly, not you.
 "Q All right, in your discussions with Mr. Woods, did he tell you where Wanda Randolph was, at the time you were discussing the alleged Murder?
"A Yes, he said she was upstairs in the Jail.
 "Q Did he relate to you the names of people that were trying to get him?
"A He said Buddy Rogers.
* * * * * *
 "Q Did these conversations occur in the chambers adjoining this room?
"A They did.
 "Q And it was immediately after the indictment was returned against Mr. Woods?
 "A I don't know if it was immediately after then. I don't remember, even if he had a preliminary hearing, but it was sometime right close to the time of the incident.
 "Q Can you remember any other particulars he related to you about what was going on and so forth?
 "A I think he said Buddy Rogers was downstairs with a gun and the only reason he was up there was so he could get his money, whatever money it was he was getting, and I never could figure that out.
 "Q Did he relate to you that Wanda Randolph was still alive?
"A Yes.
 "Q Did he tell you who he thought killed Wanda Randolph?
 "A I don't remember. The only thing I remember was her being upstairs at the Jail, she and her parents too.
 "Q On the basis of these conversations, did you form an opinion as to whether he was sane or insane? *Page 1183 
"A I felt like he was insane."
The next witness for defendant was Dr. Joseph W. Glaister, a qualified physician and psychiatrist, who examined defendant at the request of the court.
"Q You said you had about 200 patients.
 "A On the Forensic, I am just a Consultant on the Forensic Board. If I went there three times a week and I have gone more than that, I might see, especially a new patient practically every day for a week or two.
 "Q But my question is, how many times did you see this particular patient?
 "A Well I'm sure I saw him several times right after he was admitted, while he was a new patient there.
 "Q But the only time you can document is October 6, of 1976?
"A No, except for the Board, that's documentation.
 "Q Would that be before or after October 6, that the Board met?
 "A I think they were after. You know, when I do my mental status and make a diagnosis, that's my part of it and I might do that without anything like psychological tests or social history.
* * * * * *
"Q When you first examined him, was he psychotic?
 "A Yes, sir, he was having hallucinations and delusions and not being able to tell the real from the unreal in our terms, he was classified as psychotic.
 "Q Would it be fair to describe him as paranoid schizophrenic?
* * * * * *
 "Q Did you find any evidence of paranoia schizophrenia in him?
 "A Well, he had a couple of paranoid delusions. The delusion that you are being poisoned would be classified as a paranoid delusion, that somebody was trying to get the check was, also, paranoid. My initial impression was not that of paranoid schizophrenia itself, but a chronic brain syndrome, due to cerebral arteriosclerosis.
 "Q Based on the study you made on this defendant, was his mind so defective mentally, when you examined him, was the condition such that it would have destroyed his power to distinguish between right and wrong?
* * * * * *
"A Your question was?
 "Q Let me see if I can state it correctly. Was the state of his mind so that he could not tell right from wrong?
"A On the date I examined him, yes sir.
"Q Could you give the date you examined him?
 "A On or about August 26. I can get the exact date from the record.
"Q All right, look at your record.
"A August 26, 1976.
 "Q Doctor, do you have a professional opinion, as to how long this condition had existed, before you saw him?
 "A When we speak of mental deficiency, if I was correct in that diagnosis and if I was correct in the diagnosis of chronic brain syndrome. This had its beginnings at some considerable time before the date of August 26, to have increased sufficiently for these symptoms.
 "Q All right, if the evidence in this case was to show that on June 29, Mr. Woods was of the opinion that three children below the age of 14 years were having some sort of relationship with some men and there was no evidence this actually happened, could this meet your test of delusion or hallucination?
"A Yes sir."
On cross-examination the following questions and answers, inter alia appear:
 "Q My question is if you formed an opinion or can you tell the Jury your opinion, as to whether or not the defendant was afflicted with a diseased mind, on June 29 of last year to the extent he didn't know right from wrong as concerning the act of killing a little girl?
 "A It's my opinion that he was, that this alleged act did occur, because of the delusions and because of the sexual delusions of a man with a diseased mind. *Page 1184 
 "Q I'm sorry Dr. Glaister, you may have answered the question, but I didn't understand. Are you telling the Jury then that in your opinion that Jake Woods had such a diseased mind on June 29, 1976, that he didn't know the difference between right and wrong, when it came to killing a little girl?
 "A Yes, sir, that's my opinion. My opinion comes from an effort to explain for myself his actions and you can call it trying some analysis or trying to analyze Julius Ceasar but I was trying to find some explanation about this alleged incident and it's my opinion that the alleged incident must have occurred, because Mr. Woods had some delusions that this girl was sexually involved somehow and chose to correct that and therefore, I say he did not know right from wrong because he shows a horrible means of correction.
 "Q You're indicating then he wasn't under an opinion, he was being persecuted by anybody at the time the incident happened?
 "A No sir, but I'm saying he was under the influence delusions that come in the sexually (sic) sphere."
On rebuttal, the State called Melvin Hillman. This witness testified that he had known defendant about one year and a half before the little girl was killed. During the time, he had seen defendant and had conversations with him, and understood what he was saying. Witness was asked if on the day the child was killed, based on his prior conversations with him, if he had an opinion or judgment if defendant was sane or insane. He answered, "I can't be definite in saying yes I know."
This witness was a prisoner serving time in the county jail for possessing marijuana.
The next witness for the State was Darlene McGuire. She testified that she saw defendant the day it happened on June 29, 1976.
"Q Did you have a conversation with him that morning?
"A Yes.
 "Q Let me ask you this question. Did the defendant ever do anything for you? What would he do when he was at your house?
 "A He helped me fix my washing machine, move the refrigerator, put down rugs, anything I wanted him to do.
 "Q Do you have to show him how to do it and what all to do?
"A No, he knew how to do it himself.
 "Q Now based on your contact with the defendant and your conversations with him and what you saw him do and observed him do, do you have a judgment as to whether he was sane or insane on the day the little girl was killed?
* * * * * *
"Q You may answer.
"A Sane."
On cross-examination, the following questions and answers appear:
 "Q Did he tell you on the day of this killing about little girls messing around with white boys?
 "A He had told me about it, but he didn't tell me that day.
"Q When did he tell you about it?
 "A I really don't know, but he had mentioned it to me that they were.
"Q On more than one occasion?
"A He told me about twice, I recall.
* * * * * *
 "A He was sane. What he told me, I thought it was true, I'll say it like that.
 "THE COURT: He's asking you not whether he was sane or insane in this case, but if what he told you was not true, then would that effect your opinion as to whether he was sane or insane.
"A Insane, I guess, I don't know.
 "Q Mrs. McGuire, if the evidence in this case showed that the story about the boys and girls was not true and there was not truth in it, would you then think Mr. Woods was insane on that morning?
"A I guess he was insane, I just don't know."
On recall by the State of Hillman the following questions and answers appear: *Page 1185 
 "Q Melvin, I'm going to ask you to listen carefully to this question that I am asking you now. Based on your observations and your conversations and your contact with the defendant up 'til the time that the little girl was killed, everything that went on up until that time, do you have a judgment as to whether or not the defendant was sane or insane at the time the little girl was killed?
* * * * * *
"A Yes, I would say he was very sane."
On cross-examination of this witness, after recall, we quote from the record:
 "Q Have you ever seen the defendant, when he acted strange to you?
"A Yes.
"Q When was that?
 "Well, I can't be specific, again, in answering the question, but I can say on certain occasions, I couldn't say whether he had been drinking or what he was because I wasn't that close to the defendant to know, but on some occasions, I would see him have a big stick and dress up in a woman's wig and walk through the community. I seen that on a lot of occasions.
* * * * * *
 "Q Has he ever told you anything else you wouldn't believe?
"A Has he ever told me anything I wouldn't believe?
"Q Yes.
 "A On occasions, he told me he won a lot of money gambling, just a fantasy.
"Q A fantasy?
 "A Yeah, just set down and say I won a thousand dollars or something like that.
 "Q He told you things that you knew from common sense weren't true, fantasy, I believe was your term.
"A On certain occasions."
Two other witnesses, Ben C. Smith and Stewart Gregory Willis, were called by the State to testify on the issue of insanity. Objections to their testimony were sustained.
Defendant did not take the stand.
The Supreme Court in Christian v. State, Ala., 351 So.2d 623, has clearly stated that in an insanity defense to the commission of a crime, the jury, in determining the issue, must consider all the evidence relating thereto and may not arbitrarily reject or ignore the evidence of experts. This Court in Herbert v. State, Ala.Cr.App., 357 So.2d 683, cert. denied, Ala., 357 So.2d 690, summarized Christian, supra, as follows:
 "1. By statute, there is a presumption of sanity extending to all persons over the age of 14.
 "2. The defense of insanity is an affirmative defense. The burden of proving this defense rests upon the defendant and never shifts to the state.
 "3. The burden upon the defendant is to establish the issue of legal insanity by a preponderance of the evidence and to the reasonable satisfaction of the jury.
 "4. The question of insanity at the time of the commission of the crime is a matter to be determined by the jury from a consideration of all the evidence.
 "5. In making its determination, the jury may reject all expert testimony though it is without conflict.
 "6. However, opinion testimony, even of experts must be weighed by the jury and may not be arbitrarily ignored."
The court referred the defendant to Bryce Hospital, a mental institution maintained and operated by the State of Alabama, where he was committed for several weeks, there examined and observed by competent psychologists and a psychiatrist, Dr. Woddail.
It appears in the opinion that Dr. Glaister, an expert on insanity, examined defendant while he was at Bryce. He was a consultant. Dr. Glaister gave some impressive and elucidating testimony with respect to the different types of insanity and the symptomatic manifestation of the disease.
Neither of these witnesses was subject to partisan influence or bias, but assumed the *Page 1186 
examination of defendant as employees of the State, free of any outside influence. Dr. Woddail also gave impressive and informative testimony with respect to insanity and the symptoms manifesting such mental state.
Both of these witnesses concluded that defendant was legally insane at the time he committed the offense and that he did not know right from wrong.
The defendant also put up Mr. Gilliland, an attorney, as a witness who testified, supra, that the defendant was insane. The testimony of this witness is substantially set out in this opinion.
The State adduced testimony from two lay witnesses that defendant was sane. One of these was serving a jail sentence for selling marijuana.
The other was a housekeeper for whom defendant had done odd jobs in her house. She was impressed that defendant was sane.
We are impressed that the testimony of the State's lay witnesses was weak and inconclusive and certainly was not supported by any inference that they had any knowledge of the different types of insanity, the causes, or the symptoms that manifest the disease. They were just random witnesses whose knowledge of legal insanity was nil. However, the testimony of these witnesses was admissible for consideration of the jury.
But we think the preponderance and weight of the evidence sustained the plea of insanity and was sufficient to overcome the statutory presumption of sanity that obtained. Title 15, Section 422, Code of Alabama 1940, (Recomp. 1958). Christian v.State, supra.
We hold that the Court erred in overruling defendant's motion for a new trial on the ground that the verdict of the jury was contrary to the great weight of the evidence.
The judgment is reversed and the cause is remanded.
The foregoing opinion was prepared by the Honorable Bowen W. Simmons, a retired Circuit Judge, serving as a Judge of this Court, under the provisions of Section 6.10, of the new Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
REVERSED AND REMANDED.
All the Judges concur except DeCARLO, J., concurs in the result only.