A major issue on appeal is whether defendant was entitled to a directive or instruction by the trial court that the jury should find that defendant was not guilty by reason of insanity, as pleaded by him. We have considerable doubt whether defendant presented the question on the trial in such a way that it is reviewable on appeal. However, in the absence of any contention by appellee as to the reviewability of the question, we proceed to determine it.
There is no disagreement between the parties as to the applicable governing law on the subject at the time the alleged crime was committed, on December 5, 1979, prior to the effective date of the present Alabama Criminal Code. As of that time, as summarized in the Commentary to § 13A-3-1 of the Alabama Criminal Code, effective January 1, 1980, the law in Alabama as to the defense in a criminal case was:
 "Under a plea of not guilty by reason of insanity, the burden is on the defendant to clearly prove to the reasonable satisfaction of the jury that he was so affected by disease of the brain when the offense was committed as to render him so insane that he did not know right from wrong with respect to the particular offense charged, or by reason of such mental disease he could not resist doing the wrong and the crime must have been the product solely of such diseased mind."
In support of the quoted statement, the Commentary citesStreeter v. State, 278 Ala. 272, 177 So.2d 826 (1965); Aaron v.State, 271 Ala. 70, 122 So.2d 360 (1960); Lee v. State,265 Ala. 623, 93 So.2d 757 (1957); Lakey v. State, 258 Ala. 116,61 So.2d 117 (1952), and cases cited therein; Parsons v. State,81 Ala. 577, 2 So. 854 (1886). The facts in the case are undisputed. This is true as to all of the evidence as to the commission of the crime, furnished by witnesses for the State exclusively, and as to the evidence pertaining to defendant's plea of not guilty by reason of insanity, furnished by witnesses for defendant exclusively, including the officer who arrested the defendant.
We first consider defendant's evidence bearing on the question as to defendant's sanity. Such evidence has been correctly summarized in appellant's brief as follows:
 "Gary Wayne Lewis (hereinafter referred to as Lewis) was one of seven children, and led a basically normal childhood until the death of his father. Subsequent to the death of his father, Lewis developed emotional problems which led to depression and some drug and alcohol use.
 "On July 18, 1979, Lewis was admitted to the Residential Mental Health Treatment Program for Adolescents at Crocket Academy, in Nashville, Tennessee, and remained in this facility until discharged on November 21, 1979, because he turned 18 years of age. Mrs. Frances Priest, Lewis' counsellor at the Crocket Academy, testified that at the time of Lewis' release, it was her judgment that he was not always able to do what was right even though knowing the difference between right and wrong.
 "As a child, Lewis had a turbulent childhood in that his father had an alcohol problem and Lewis was abused from a very early age. Lewis was administered alcohol by a family member at approximately 4 years of age. Lewis had received mental health treatment at the State Mental Health Facility in Decatur, Alabama.
 "Between Lewis' return from the Crocket Academy on November 21, 1979, and the date of the robbery on December 5, 1979, Lewis exhibited irrational conduct evidencing his insanity. Lewis would sit to *Page 472 
himself, talking irrationally, with jerking actions and threatened suicide. During this period of time, one night he ran screaming and crying into the street saying he wanted to die and jumped into the path of a moving automobile. The automobile narrowly stopped and avoided striking Lewis, and several people found it necessary to forcibly throw Lewis to the ground and restrain him. On another occasion during this same period of time, Lewis went berserk in his sister's home and did great damage to her room.
". . . .
 "While in the custody of the Limestone County Sheriff's Department [after his arrest for another crime charged on the same day as this crime], Lewis attempted suicide by cutting his throat. From the Limestone County Hospital, Lewis was transferred on April 10, 1980, to Bryce Hospital and remained there until April 27, 1981, when he was returned to the Limestone County Jail for trial on a robbery charge [charge in the instant case].
 "During the time Lewis was at Bryce Hospital, he was under the primary care and treatment of Dr. Thomas L. Smith, Jr., a Psychiatrist with a Law Degree from the University of Alabama and who performed Psychiatric Residency at the University of Alabama Hospital in Birmingham. During the time Lewis was at Bryce Hospital, he was seen by Dr. Smith a minimum of 48 to 50 times. Dr. Smith first felt Lewis' actions while at Bryce Hospital were self-serving, but testified that he later realized that Lewis was suffering from mental illness and could not do what would be considered right. Lewis' actions involved hallucinations, bizarre conduct, depression, barking like a dog, banging his head against a wall, and auditory hallucinations, in which Lewis felt that his deceased father was trying to control his mind and putting thoughts in his head. Lewis was determined to have a full scale I.Q. of 83 and was determined to be slightly retarded. From all of his observations and treatment, Dr. Smith testified at trial that it was his judgment that on December 5, 1979, Lewis had a mental illness and that he was unable to distinguish right from wrong and that because of his mental illness, he could not do what could be considered right. The doctor was not allowed to testify as to whether Gary Wayne Lewis was sane or insane on December 5, 1979.[1]"
In further support of his plea of not guilty by reason of insanity, defendant called Officer Blakely as a witness. Appellant summarizes the testimony of Officer Blakely as follows:
 "Shortly thereafter [after the robbery], a State Trooper called to the scene of the robbery apprehended Lewis. In and about arresting Lewis, the Trooper drew his pistol on Lewis who was unarmed. Lewis walked toward the officer telling him that he would have to kill him as he wasn't going to jail. The Trooper testified that this was extremely abnormal behavior for anyone under these circumstances."
The undisputed facts as to the circumstances of the alleged crime were that on December 5, 1979, defendant entered Cross Key Grocery Store with a pistol in his hand, a mask on his face and sunglasses over his eyes. He was dressed in blue jeans, and he robbed the manager of the store, Mr. Billy Cook, and Mr. Franklin Kelley, who was calling on the store as a salesman. According to Mr. Kelley's testimony, "Well, the first thing he told Billy Cook, he was facing Billy as he walked in and I had my back to him. He had this gun in his hand and he said he wanted Mr. Cook's money and so he said okay, and he had to come by me. So, Mr. Cook just motioned me to come around the counter where he was and I turned and *Page 473 
faced him then and told me as he walked by to go to the register, that it was his store but that he wanted my money too." According to further testimony of Mr. Kelley, he was robbed by defendant of "around a $147.00 in cash and two cheeks," and defendant placed the money and the checks in a "money bag someone would take to the bank." The witness further said that "I might have seen his hand shaking maybe just a little bit and when he said he didn't want to hurt anyone and all he wanted was Cook's money and then later, you know, he told me he wanted my money too."
Mr. Cook testified, inter alia:
 "Yes, a little after 12:00 a guy came running in the store with a ski mask on, sun glasses, an old hat pulled down over his head. He threw a pistol on me and said he wanted my money. Said he didn't want to hurt anybody but wanted our money. There was a salesman in the store at the time standing in front of the cash out counter and after he told me that he threw the pistol on the salesman and told him he wanted his billfold and then made us move back away from the check out counter and he came around behind the counter after getting the salesman billfold. And he couldn't open the cash register and I opened it for him. I told him not to tear it up and I'd open it for him. And he told me he wanted my billfold and I told him I didn't have one. Then he told me to move back, me and the salesman. While he was getting the money out of the cash register I eased back toward the back of the store and as he was getting the money out of the cash register he dropped some money on the floor. And when he dropped it on the floor and reached down to pick it up I moved back to the back of the store trying to get my pistol. When he came in around the counter he dropped some more money on the floor. He reached down to pick that up and it gave me chance to get to my pistol. And when got to my pistol, just as he raised up of the floor, I shot at him and missed him of course.
"Q. All right. Did the person run out the door then?
 "A. He ran out the door and I ran behind him and shot at him four times.
 "Q. Okay. Did you notice which direction or where the person ran?
 "A. Yes, he ran east of Cross Key's Road behind the store.
 "Q. Okay. Did you call the police or did someone else?
 "A. I had the milkman. He was outside in the truck, call the police."
Mr. Cook further testified that after defendant cleared the store and the immediate vicinity, Mr. Cook and someone else chased him, partly by using a truck and running defendant into a pasture, into which they followed him until he escaped them by crossing a fence. They returned from the pasture and went to the Poff Road, which was "a mile or more east of Cross Key Grocery and we turned right and I watched him as he ran into the woods." Thereafter State Trooper Mike Blakely appeared, located the defendant and placed him under arrest. At the time of the arrest, defendant did not have a gun. Officer Blakely testified that defendant was running, that the officer fired "one warning shot for him to stop," and that defendant stopped soon thereafter and was subdued by Officer Blakely.
Both parties rely upon Boyle v. State, 229 Ala. 212,154 So. 575 (1934)[2] in which it was said at 154 So. 583: *Page 474 
 "Cases of insanity may be so clear, the proof so strong and undisputed, that the jury should be instructed in like form. "But courts should be careful not to invade the province of the jury in cases of this character. Although the evidence may be offered only by the defense, and all tend to one conclusion, yet, in view of the presumption of sanity, if the evidence is inconclusive, and reasonable inferences may be drawn that the act was that of a sane man as defined by law, the affirmative charge should be refused."
In Herbert v. State, Ala.Cr.App., 357 So.2d 683, cert. denied,357 So.2d 690 (1978), there was a reversal for the refusal of the trial court to instruct the jury, upon written request of defendant, that it should find the defendant "not guilty by reason of insanity." It was noted in the opinion that in two cases only (Pickett v. State, 37 Ala. App. 410, 71 So.2d 102, cert. denied, 260 Ala. 699, 71 So.2d 107 (1954) and Christianv. State, Ala., 351 So.2d 626 (1977)) had there been reversals for that reason. There has since been added to the list a fourth case, Sasser v. State, Ala.Cr.App., 387 So.2d 237
(1980), cert. denied, 387 So.2d 244.
We now consider each of the four cases in Alabama in which it has been held that the defendant was entitled to an affirmative charge in his favor instructing the jury to render a verdict finding the defendant not guilty by reason of insanity. We do so in the chronological order of the cases.[3]
In Pickett v. State, supra, defendant had appealed from a conviction of murder in the second degree. The homicide had occurred as the finale to a fish fry to the accompaniment of guitar music and dancing conducted at the home of the deceased. Participants therein included the deceased, the defendant, defendant's brother and defendant's father. In arriving at its conclusion in the case, the court said at 71 So.2d 107:
 "This aside, we are convinced that the overwhelming evidence presented by the defense has amply overcome the presumption of sanity as to this accused; that the undisputed evidence shows this accused to be a mental defective of the mental age of four or five years, in other words, an imbecile."
In the instant case, Dr. Smith testified that defendant's "full scale I.Q. was 83, which is really borderline . . . Just a little bit below normal."
In each of the other three cases in which it has been held in Alabama that the jury should have been instructed to find the defendant not guilty by reason of insanity, the defendant at the time of the crime exhibited strange, irrational, bizarre and even maniacal behavior. In Christian v. State, supra, the defendant had beaten his mother to death, poured some substance over her body and set the body on fire. In Herbert v. State,supra, the defendant killed his wife in the apparent belief that she was in reality, not merely figuratively, a demon. He belonged to a religious group that believed in the existence on the earth of real demons. In Sasser v. State, supra, the defendant was convicted of an assault with a rifle upon a deputy sheriff while in the active discharge of his duties. The officer had been attempting to locate defendant and arrest him on a warrant for a previous crime. The defendant purloined an automatic rifle with a scope thereon that belonged to the resident of an apartment in a motel, went out on a nearby highway, in open view of the public, pointed the rifle down the road, looked through the scope of *Page 475 
it and finally shot it three times, one shot hitting the officer who had a warrant for defendant as the officer was driving his automobile on the highway. The defendant then returned to the motel, went into its restaurant with his rifle, ordered the occupants out of the restaurant and thereafter used the truck of the manager of the motel, drove off in the truck and wrecked it. He was then arrested by a group of officers, including the officer in the automobile at which the defendant had previously fired the rifle.
In none of the cases in which there was a reversal for the refusal to instruct or direct the jury to render a verdict finding defendant not guilty by reason of insanity did he have anything material to gain by his crime. The crime itself, according to the circumstances, evinced fool-hardiness, which, instead of being opposed to the undisputed opinion evidence of defendant's insanity, tended to confirm it. Not so, in the instant case, which we now contrast to cases upon which appellant relies.
Except for the fact that robbery is always unwise, as well as criminal, we find little, if anything, in the circumstances of the robbery that tends to show a deranged mind. It was cool, calculated and deliberate, stemming largely from "the root of all kinds of evil" — "the love of money." It was successful and was conducted in a manner that is generally conducive to success in the perpetration of a robbery. It was at a time of day when customers of such a store would usually be eating their noon meals. The robbery was doubly successful in that he obtained substantial money from each of two people. The robber succeeded in averting identification at the time by his mask and sunglasses. In some way, he succeeded in eluding the shot fired from a pistol in the hand of Mr. Cook, left the store unharmed, then moved with such deftness as to prevent his being hit by shots from the pistol fired by Mr. Cook, and continued to escape Mr. Cook traveling in a truck for approximately a mile and was not captured immediately thereafter, not until Trooper Blakely had arrived and taken charge.
We do not consider, as does appellant, that the fact that defendant told his victims that all he wanted was money and that he did not wish to harm any one of them as evidence of insanity. It could as well have been the statement of a sane robber as that of an insane one. Neither do we consider the testimony of Officer Blakely that he considered the conduct of defendant while being apprehended by Officer Blakely "very abnormal," in that defendant told him that he "would have to kill him," that "he wasn't going to jail" and that Officer Blakely had to wrestle with and subdue him as evidence in favor of defendant on the issue as to his sanity. Conceivably, it could be so considered, but whether it was favorable to the prosecution, the defendant, or to neither, the jury was in a better position to determine than are we.
There are some other incidents that have some bearing upon the issue now considered. The pistol in the hand of defendant as he committed the robbery and which he continued to hold in his hand until after he left the store was apparently never found. It was not on him at the time he was captured. No one knows better than he as to what happened to the pistol. His counsel, in questioning witnesses, intimated by his questions that the pistol possessed by defendant was a "blank pistol." There is nothing in any of the opinion evidence in the case to the effect that defendant did not know what kind of pistol he had or what disposition he made of the pistol. In the light of his having the burden to reasonably satisfy the jury of his plea of not guilty by reason of insanity, it seems logical that the absence of any evidence to support any theory that the pistol was a "blank pistol" or to show what happened to the pistol, is chargeable to the defendant and not to the State. Also, it is to be noted that, according to the testimony of Mr. Cook, he was never returned about one-half of the money taken from his cash register and placed by defendant into the white money bag that he brought with him to the store. The burden was not upon the defendant on the issue raised by the plea of not guilty, nor on the State on the issue *Page 476 
raised by the defendant's plea of not guilty by reason of insanity, to show where the missing money was. The absence of any evidence on the point or any explanation for such absence tends to weaken the defense of not guilty by reason of insanity.
Even though we may be persuaded, with due deference to the eminent psychiatrists who testified in favor of defendant and to the other witnesses who expressed their opinions on the subject, that defendant was insane at the time of the crime, we are not convinced that such evidence was so strong and conclusive that the issue should not have been submitted to the jury.
The only other contention for a reversal is that there was error in the "failure of the court to allow testimony as to specific instances of abnormal behavior subsequent to the commission of the crime." The contention is based upon the following portion of the transcript during the direct examination by defendant's counsel of Dr. Smith:
 "Q. Taking your records again, doctor, I think you mentioned to me and maybe to Marc there was a specific instance and some things that happened down there and I wish you would go through and relate to the jury some of the things that happened in there to demonstrate to you that he may be insane.
 "MR. SANDLIN: Judge, I believe we are going to object to any accounts of certain instances. It's not relevant. I don't think its relevant to what happened on December 5, 1979.
"THE COURT: Well, I would have to sustain that."
We are not certain as to what all was meant by the question or by the objection, and for that reason we cannot with reasonable certainty assay the court's ruling. However, we readily see from the ten preceding pages of the transcript of the direct examination of the witness that the witness had already mentioned several "specific" instances found in his records that tended to confirm his opinion that defendant was insane. An answer to the question would have been largely, in our opinion, repetitive of what he had already testified, and for that reason there was no substantial injury to defendant in the sustention of defendant's objection.
The record is free of error prejudicial to defendant. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge Leigh M. Clark, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby
AFFIRMED.
All the Judges concur.
[1] The "bench conference" from which this statement seems perhaps to have been based is not revealed by the transcript, and appellant makes no separate point with reference to it. The final diagnosis of Dr. Smith concerning Lewis was schizo health disorder and schizophrenia. Lewis was administered immense quantities of the drug Thorazine in an attempt to control his mental illness.
[2] It is though by many, not by the parties in this case, that in Boyle v. State, there was a reversal by reason of the trial court's submission to the jury of the question of defendant's insanity instead of charging the jury that it should find the defendant "not guilty by reason of insanity." This is not correct. Although that question was the subject of most of the outstandingly able opinion by Mr. Justice Bouldin in the case, it was decided favorably to the appellee, and the only ground of reversal was as to the action of the trial court in overruling defendant's objection to argument of counsel for the State to the effect that if it found defendant "not guilty by reason of insanity," he would soon be free. The case is famous for the fact that six of Alabama's most distinguished physicians, including Dr. W.D. Partlow, Superintendent of the Alabama Insane Hospital, and other specialists in mental disease, testified almost, if not entirely, unreservedly, that defendant was insane in their opinion, in response to that which is perhaps the longest correct hypothetical question ever propounded to a witness in the courtroom. The question consisted of two sentences only, but it was two and one-half pages long, as shown by its verbatim recital in the statement of facts immediately preceding the opinion in the case. See Judge McElroy and Judge Hughes on Expert Testimony, 31 AlabamaLawyer, 489, 503 (October 1970). The appellant-defendant died before he could be tried again.
[3] Not included is Woods v. State, Ala.Cr.App., 364 So.2d 1178
(1978), cert. denied, 364 So.2d 1186, in which the issue was as to the weight of the evidence as raised by defendant's motion for a new trial.