To an indictment charging assault in the second degree, Michael Steven Alvis pleaded not guilty and not guilty by reason of insanity. After a Jefferson County jury found him guilty as charged, the trial court sentenced him to "fifteen years in the penitentiary." On appeal, he claims that his conviction should be reversed because the victim did not suffer a "serious physical injury" as required by the assault statute and because the evidence of insanity was so overwhelming.
William T. Morrison, the victim of the assault, testified that he and his wife were driving away from a restaurant about 7:45 *Page 860 
p.m. when he saw the appellant running down the street. As Morrison's automobile neared an intersection, appellant ran in front of the vehicle and put up his hands. Morrison slowed down and appellant grabbed the door handle, opened the car door, and began to beat Mr. Morrison on the head and chest. Morrison testified that appellant hit him repeatedly for a period of one to two minutes until he managed to kick appellant in the stomach and drive away. Morrison stated that he had never seen appellant before that same evening and had done nothing to provoke the assault in question.
Immediately after the attack Morrison had difficulty breathing, his rib cage was sore, and he coughed up blood. He recounted the fact that he had had a heart attack six years earlier and currently suffered from angina, hypertension, and lung problems.
Trussville police officer and paramedic Mike Knizel arrived on the scene, checked Mr. Morrison's condition, and determined that he was not having a heart attack. The officer then approached the appellant who was standing in the street cursing loudly. When backup units arrived, Knizel returned to aid the victim. On cross-examination, he admitted that, had he believed Mr. Morrison to be "in serious trouble," he would never have left him initially. R. 76.
When Officer Knizel returned to the place where the other officers were questioning the appellant, he noticed that the appellant was standing still, staring ahead, and not speaking. According to Knizel, when appellant was arrested and put in a patrol car, he began to kick, scream and spit at the officers. He had to be forcibly removed from the patrol car and carried to his cell in the jail, where he struck out at Officer Knizel.
Dr. Vijy Caplash testified that he had been treating the victim, Mr. William Morrison, for the past six years. He examined Morrison the day following the beating and noted that his blood pressure was normal but that he was coughing up a small amount of blood. Dr. Caplash contrasted the victim's condition to the preceding evening when he was seen in the emergency room with a blood pressure of 230/100, which he described as "dangerously high." R. 30. The physician found no broken ribs or damage to the heart but concluded that there had been some leakage of blood from the lung caused by blunt trauma. When asked whether the injury Mr. Morrison received created a substantial risk of death, Dr. Caplash stated, "It could have caused serious injury because of the background of the patient, that he has coronary disease. Any emotional trauma or physical trauma could have caused a risk due to this condition. But there was no evidence of that in this case." R. 33. Dr. Caplash explained that Morrison was admitted to the hospital on August 8, for observation, and discharged on August 11. He noted the victim had a slight contusion on his face.
At the conclusion of the State's case, the defense moved for a judgment of acquittal on the basis that the State failed to establish the offense of assault in the second degree, there being no evidence of a "serious physical injury." Ruling that a criminal defendant "takes the victim as he finds him," the trial court overruled the motion.
The first witness for the defense was Thomas J. Alvis, appellant's father, who testified that his son began having emotional problems following a coma and a very high fever at the age of two. The boy was treated with dilantin as a child and finished the seventh grade in school. At the age of eighteen or nineteen, he was sent to Bryce Hospital for drug-related problems and later spent two years in the state prison at Atmore.
In 1974, when his son was in his early twenties, he voluntarily admitted himself to Brookwood Hospital for psychiatric treatment. After being hospitalized seven to ten days, he was diagnosed as paranoid. Upon his discharge, appellant went to Kentucky where a state trooper spotted him driving his car in a blinding rainstorm and throwing his personal belongings out the windows. In June, 1975, he was committed *Page 861 
to the Kentucky State Mental Hospital where he remained for eight months.
Appellant returned to Alabama and found a job, but he later disappeared and his father had no contact with him until he was brought back to the State by Texas authorities following an incident in which he tried to run a deputy sheriff off the road. He was admitted to the psychiatric ward at UAB Hospital and discharged on medication after several weeks. Mr. Alvis testified that every time his son was released from a mental treatment facility he was given medication which, as long as he took it, controlled his behavior. However, once his son stopped taking the medicine, he reverted to the same problems he had experienced earlier in his life as a result of mental illness.
Mr. Alvis related another incident in which his son drove off with an automobile while the owner was stopped at a service station. He was apprehended and later readmitted to the UAB Hospital mental ward where he was diagnosed as a paranoid schizophrenic. On another occasion, according to appellant's father, appellant stole a school bus at 3:00 a.m., after which appellant was formally committed to Bryce Hospital following a hearing in Jefferson County Probate Court. He remained at Bryce for three months and, once again, was released on medication. Appellant discontinued the medication and gradually began to lose touch with reality, claiming that he was Jesus Christ and denying that Mr. Alvis was his father.
Appellant then decided to go to California and he progressed as far as Livingston, Alabama, where he was arrested for running cars off the road. Another Probate Court commitment hearing was held, but appellant became so violent he could not attend. Appellant was again sent to Bryce in February, 1981, where he remained for several months, and after his discharge he disappeared. He was subsequently recommitted to Bryce andwas on trial release from Bryce Hospital when the incident with Mr. Morrison occurred.
The defense next offered and read into evidence the deposition of Dr. James C. Thompson, a staff psychiatrist at Bryce Hospital. Dr. Thompson evaluated appellant's mental state in May, 1982, as the result of a court-ordered psychiatric examination and competency determination. He concluded that appellant was competent to stand trial for the instant offense, but at the time of the alleged assault appellant lacked thecapacity to appreciate the criminality of his conduct and toconform his conduct to the requirements of the law.
Dr. Thompson testified that at the time of the incident in question appellant was psychotic, suffering from schizoaffective disorder. The psychiatrist stated that appellant had a mental illness caused by a chemical imbalance
in the brain. Although Dr. Thompson gave his opinion that appellant's disease was "in remission," meaning there were "no overt psychotic symtoms" at the present, he stated that he could expect appellant's illness to be controlled only by remaining on medication. R. 185. Appellant had, to his knowledge, been committed to Bryce Hospital on three occasions: February, 1980; February, 1981; and April, 1982.
The next defense witness, Dr. Clifford B. Hardin, another staff psychiatrist at Bryce Hospital, testified that he first treated appellant in 1980 following a Probate Court commitment from Sumter County. At that time appellant was attempting to push his way out of the hospital door and was claiming to be Jesus Christ. Appellant hit Dr. Hardin after the psychiatrist expressed doubt about appellant's claimed identity.
Dr. Hardin stated that he had observed appellant on many occasions and considered him, when off his medication, to be "about as psychotic as anyone I have ever seen." R. 238. In the physician's opinion, appellant was suffering from paranoid schizophrenia and was one of the "more difficult" mental patients he had. R. 229. He testified that appellant had, in the past, exhibited suicidal tendencies, heard voices, and rammed automobiles at high speed because of his belief that they contained demons. *Page 862 
After the defense rested, the State called Mr. William Morrison in rebuttal. Morrison testified that in his opinion appellant was "sane. An angry person, but sane." He based his answer on "the smoothness of [appellant's] actions. . . . He was coordinated." R. 251. On cross-examination, Mr. Morrison admitted that he observed appellant for possibly two minutes or less and would not have stopped his vehicle if he had known of appellant's history of hospitalizations for mental disorders. He also acknowledged that he had heard that appellant signed his name as "Jesus Christ" when he was booked at the Trussville jail.
 I
Appellant maintains that his motion for judgment of acquittal should have been granted because Mr. Morrison was not the victim of an assault in the second degree. That offense is defined, in pertinent part, in section 13A-6-21, Code of Alabama 1975:
 "(a) A person commits the crime of assault in the second degree if: (1) With intent to cause serious physical injury to another person, he causes serious physical injury to any person. . . .
"Serious physical injury" is defined in section 13A-1-2 (9) as:
 "Physical injury which creates a substantial risk of death, or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."
Given the testimony of Dr. Caplash that Mr. Morrison suffered no broken bones, heart damage or other disfiguring injury and was in the hospital two and one-half days merely for observation, we do not believe it can seriously be contended that the assault caused "serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." Compare Thomasv. State, 418 So.2d 964 (Ala.Cr.App. 1982) (victim of gunshot wounds bedridden for two weeks, and in pain from scar tissue pressing on spinal nerves). Lebo v. State, 55 Ala. App. 624,318 So.2d 319, cert. denied, 294 Ala. 763, 318 So.2d 324 (1975), (elderly victim required one weeks' hospitalization from beating with fists).
In addition, although we agree in principle with the trial judge's statement that a criminal defendant "takes the victim as he finds him," see State v. Morea, 2 Ala. 275 (1841);Flanagan v. State, 369 So.2d 46, 49 (Ala.Cr.App. 1979), it is apparent that the assault did not trigger a "substantial risk of death" even in view of Mr. Morrison's preexisting physical condition. Dr. Caplash testified that the beating "could havecaused a risk due to this [coronary] condition. But there wasno evidence of that in this case." (Emphasis added). Thus, although the victim may have encountered some risk of death, the physician could not say that it was a substantial risk. SeeGoode v. State, 408 So.2d 198 (Ala.Cr.App. 1981) (victim's testimony that wound "hurt" was not evidence of "substantial pain."). In addition, Officer Knizel testified that he would not have left the victim if he had believed him to be "in serious trouble." Based on the foregoing, it is our judgment that the trial court erred by overruling the motion for judgment of acquittal as to the offense of second degree assault under the evidence in this cause.
 II
We also believe the evidence of insanity in the present case was here so overwhelming, that the verdict of the jury was clearly contrary to the great preponderance of the evidence. As our Supreme Court explained in Christian v. State,351 So.2d 623, 624 (Ala. 1977), the principles underlying a plea of insanity may be summarized as follows:
 "1. By statute, there is a presumption of sanity extending to all persons over the age of 14.
 "2. The defense of insanity is an affirmative defense. The burden of proving this defense rests upon the defendant and never shifts to the state.
 "3. The burden upon the defendant is to establish the issue of legal insanity by a *Page 863 
preponderance of the evidence and to the reasonable satisfaction of the jury.
 "4. The question of insanity at the time of the commission of the crime is a matter to be determined by the jury from a consideration of all the evidence.
 "5. In making its determination, the jury may reject all expert testimony though it is without conflict.
 "6. However, opinion testimony, even of experts must be weighed by the jury and may not be arbitrarily ignored."
Cunningham v. State, 426 So.2d 484 (Ala.Cr.App. 1982).
In the case before us, the great weight of the evidence pointed to the appellant's insanity at the time of the commission of this offense. Like the six Alabama cases in which a guilty verdict has been also overturned based on the overwhelming evidence of insanity, the evidence here reveals that the expert medical testimony was strong, convincing, and undisputed by other expert opinion. See Smith v. State,411 So.2d 839 (Ala.Cr.App. 1981), cert. denied, 411 So.2d 839 (Ala. 1982); Sasser v. State, 387 So.2d 237 (Ala.Cr.App.), cert. denied, 387 So.2d 244 (Ala.), cert. denied, 450 U.S. 924,101 S.Ct. 1376, 67 L.Ed.2d 353 (1980); Woods v. State,364 So.2d 1178 (Ala.Cr.App.), cert. denied, 364 So.2d 1186 (Ala. 1978);Herbert v. State, 357 So.2d 683 (Ala.Cr.App.), cert. denied,357 So.2d 690 (Ala. 1978); Christian v. State, 351 So.2d 623
(Ala. 1977); Pickett v. State, 37 Ala. App. 410, 71 So.2d 102, cert. denied, 260 Ala. 699, 71 So.2d 107 (1954).
Furthermore, both of the experts who gave their opinion that appellant was insane were members of the Bryce Hospital Forensic Evaluation Board, employees of the State of Alabama, and had no reason to be biased in appellant's favor. See Woodsv. State, supra. They were acting pursuant to circuit court order and had numerous opportunities to observe and to evaluate this appellant's condition.
In contrast, the single bit of evidence that appellant was "sane" came from the victim, who had never seen appellant before the instant encounter and who observed appellant for "two minutes or less" and who was endeavoring to defend himself. In our judgment, the victim's testimony here did not outweigh the overwhelming statements of credible experts and lay witnesses that appellant was insane. We think the victim's testimony in the present case is distinguishable from the evidence presented in both Bowen v. State, 386 So.2d 489
(Ala.Cr.App.), cert. denied, 386 So.2d 492 (Ala. 1980), andGraham v. State, 383 So.2d 892 (Ala.Cr.App.), cert. denied,383 So.2d 895 (Ala. 1980).
In Bowen, the victim's mother and brother, both of whom testified the accused was sane, had known the defendant for seven or eight years, and one of them had overheard the defendant say he was going to "get" the victim and then claim insanity as a defense. In Graham, this court noted that the two victims who gave their opinion the defendant was sane had "ample opportunity to observe" the conduct of the accused, and were therefore more credible witnesses than those presented by the State in Woods.
In Woods, both rebuttal witnesses for the State equivocated on the issue of the defendant's sanity. This court did not find their testimony sufficient to overcome the defendant's evidence of insanity, and we commented as follows:
 "We are impressed that the testimony of the State's lay witnesses was weak and inconclusive and certainly was not supported by any inference that they had any knowledge of the different types of insanity, the causes, or the symptoms that manifest the disease. They were just random witnesses whose knowledge of legal insanity was nil."
364 So.2d at 1186. We find Mr. Morrison's testimony in the instant case also weak and inconclusive and unable to overcome appellant's evidence of his insanity.
The appellant's evidence also included testimony from his father recounting a long history of mental disorders and hospitalization for psychiatric treatment. See Christian v.State, supra. Furthermore, appellant's conduct at the time of his encounter with Mr. Morrison did not provide an inference of sanity. *Page 864 
After the beating, appellant did not display a consciousness of guilt in an attempt to flee or hide. Compare Cunningham v.State, 426 So.2d 484, 490 (Ala.Cr.App. 1982); Thomas v. State,418 So.2d 199 (Ala.Cr.App. 1982); Lewis v. State, 414 So.2d 470
(Ala.Cr.App. 1982); Bowen v. State, supra. In addition, appellant's act of striking Mr. Morrison was bizarre, unprovoked, and apparently without rational basis. CompareCunningham v. State, (murder for revenge); Thomas v. State, (robbery); Lewis v. State, (same); Bowen v. State, (same). In short, there was nothing about appellant's conduct or demeanor on the occasion in question from which the jury could reasonably infer that his actions were those of a sane man.Compare Cunningham v. State, supra at 491, ("The defendant's conduct and demeanor immediately after the crime provided a reasonable inference of sanity.")
Although the jury is entitled to reject all expert testimony, even if it is without conflict, the jury may not ignore the opinions of experts. Christian, supra. Given the strength of this expert testimony here presented, as contrasted with the weakness of the State's rebuttal evidence, it is our judgment that the guilty verdict must be labeled as "arbitrary". We cannot say that the jury had "ample facts from which to draw an inference that the accused was in fact sane." Bullard v. State,408 So.2d 164, 167 (Ala.Cr.App.), cert. denied, 408 So.2d 167
(Ala. 1982).
For the errors stated, this case is hereby reversed and rendered.
REVERSED AND RENDERED.
All the Judges concur.